# United States Court of Appeals

*for the*

# First Circuit

Case Nos. 19-1586, 19-1640

PROJECT VERITAS ACTION FUND,

*Plaintiff-Appellee-Cross-Appellant,*

v.

RACHAEL S. ROLLINS, in her Official Capacity
as District Attorney for Suffolk County,

*Defendant-Appellant-Cross-Appellant.*

Case No. 19-1629

K. ERIC MARTIN & RENÉ PÉREZ,

*Plaintiffs-Appellees,*

v.

RACHAEL S. ROLLINS, in her Official Capacity
as District Attorney for Suffolk County,

*Defendant-Appellant,*

WILLIAM G. GROSS, in his Official Capacity
as Police Commissioner for the City of Boston,

*Defendant.*

ON APPEAL FROM JUDGMENTS OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

## BRIEF FOR PLAINTIFFS-APPELLEES
## K. ERIC MARTIN & RENÉ PÉREZ

JESSIE J. ROSSMAN (BAR NO. 1161236)
MATTHEW R. SEGAL (BAR NO. 1151872)
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF MASSACHUSETTS, INC.
211 Congress Street, 3rd Floor
Boston, Massachusetts 02110
(617) 482-3170

WILLIAM D. DALSEN (BAR NO. 1182437)
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110
(617) 526-9600

*Attorneys for Plaintiffs-Appellees*

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................... 1

Jurisdictional Statement ........................................................................................ 5

Issues Presented .................................................................................................... 6

Statement of the Case ........................................................................................... 7

I.     Statement of facts ........................................................................................ 7

    A.     Section 99 entirely prohibits secretly recording police officers performing their duties in public spaces, and no justification for that prohibition appears in the law or its legislative history. ..................... 7

    B.     The Boston Police Department and the Suffolk County District Attorney's training and practice enforces Section 99 against individuals who secretly record police officers performing their duties in public spaces. ................................................................... 8

    C.     But for Section 99, plaintiffs Martin and Pérez would secretly record police officers performing their duties in public spaces ................ 9

II.    Procedural history ...................................................................................... 11

Summary of Arugment .......................................................................................... 13

Argument ............................................................................................................... 16

I.     Standard of review ...................................................................................... 16

II.    Plaintiffs' claim is ripe because they have shown an intent to engage in prohibited conduct, a step in furtherance of that intent, and a reasonable fear of enforcement. ................................................................................... 18

    A.     The standard for ripeness in a First Amendment declaratory judgment action turns on a reasonable fear of enforcement. ................. 18

    B.     Plaintiffs' First Amendment claim for a declaratory judgment is ripe. ................................................................................................... 20

    C.     The District Attorney's ripeness argument misapprehends the record and the law. ................................................................................ 22

III.   As applied to the secret recording of police officers performing their duties in public spaces, Section 99 violates the First Amendment because it is not narrowly tailored to a significant government interest and does not preserve adequate alternatives. ....................................................... 26

    A.     This case implicates an important First Amendment right. .................... 27

B.  Intermediate scrutiny applies to Martin and Pérez's claim........................31

C.  Section 99, as applied to recordings of police officers performing their duties in public spaces, cannot survive intermediate scrutiny. ........34

    (i)  Section 99's prohibition against secretly recording police officers performing their duties in public spaces is not supported by a significant government interest. ............................34

    (ii)  Section 99's prohibition of secretly recording police officers performing their duties in public spaces is not narrowly tailored to the purported government interest in civilian awareness. ............................................................................................40

    (iii)  Section 99's prohibition of secretly recording police officers performing their duties in public spaces does not preserve adequate alternative avenues of expression ......................................43

D.  Because the challenged application of Section 99 does not survive intermediate scrutiny, it is unconstitutionally preventing Martin and Pérez from secretly recording police officers performing their duties in public spaces. ...................................................................................45

Conclusion.................................................................................................................49

Certificate of Compliance......................................................................................51

Certificate of Service..............................................................................................52

Addendum:

Order Granting Defendant's Motion to Dismiss, State of New Hampshire v. Alfredo Valentin, Docket No. 216-2015-CR-766 (Oct. 21, 2015, N.H. Sup. Ct)...............................................................ADD-1

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*281 Care Committee v. Arneson,*
 638 F.3d 621 (8th Cir. 2011) ........................................................................25

*Act Now to Stop War and End Racism Coalition and Muslim American Society*
 *Freedom Foundation v. District of Columbia,*
 846 F.3d 391 (D.C. Cir. 2017) ......................................................................25

*American Civil Liberties Union of Illinois v. Alvarez,*
 679 F.3d 583 (7th Cir. 2012) ..................................................................passim

*Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla,*
 490 F.3d 1 (1st Cir. 2007) .......................................................................passim

*Babbitt v. United Farm Workers Nat. Union,*
 442 U.S. 289 (1979) ......................................................................................26

*Bacon v. McKeithen,*
 No. 5:14-cv-37, 2014 WL 12479640 (N.D. Fl. Aug. 28, 2014) ...................30

*Boston Police Patrolman's Association v. City of Boston,*
 No. 16-cv-02670 (Super. Ct. Suffolk County Sept. 6, 2016)........................36

*Bruni v. City of Pittsburgh,*
 824 F.3d 353 (3rd Cir. 2016) ........................................................................32

*Commonwealth v. Hyde,*
 434 Mass. 594 750 N.E.2d 963 (2001) ...........................................................6

*Cutting v. City of Portland,*
 802 F.3d 79 (1st Cir. 2015) ...........................................................................43

*Doe v. City of Albuqurque,*
 667 F.3d 1111 (10th Cir. 2012)......................................................................32

*Frisby v. Schultz,*
 487 U.S. 474 (1988) ................................................................................39, 40

*Giguere v. Port Resources, Inc.*,
  927 F.3d 43 (1st Cir. 2019) ...................................................................... 16, 17

*Glik v. Cunniffe*,
  655 F.3d 78 (1st Cir. 2011) ...................................................................... passim

*Globe Newspapers Co. v. Beacon Hill Architectural Com'n*,
  100 F.3d 175 (1st Cir. 1996) ............................................................................40

*Hague v. Committee for Indus. Org.*,
  307 U.S. 496 (1939) ..........................................................................................48

*Hill v. Colorado*,
  530 U.S. 703 (2000) ..........................................................................................39

*Iacobucci v. Boulter*,
  193 F.3d 14 (1st Cir. 1999) ..............................................................................46

*In re the Financial Oversight and Management Board for Puerto Rico*,
  916 F.3d 98 (1st Cir. 2019) ..............................................................................25

*In re the Financial Oversight and Management Board for Puerto Rico*,
  919 F.3d 638 (1st Cir. 2019) ............................................................................25

*Jean v. Mass. State Police*,
  492 F.3d 24 (1st Cir. 2007) ...................................................................... passim

*John Doe No. 1 v. Reed*,
  561 U.S. 186 (2010) ..........................................................................................31

*Kines v. Day*,
  754 F.2d 28 (1st Cir. 1985) ..............................................................................26

*Kovacs v. Cooper*,
  336 U.S. 77 (1949) ............................................................................................39

*Labor Relations Division of Construction Industries of Massachuestts, Inc. v.
  Healey*,
  844 F.3d 318 (1st Cir. 2016) ................................................................... 16, 17

*Martin v. Evans*,
  241 F. Supp. 3d 276 (D. Mass. 2017) ..............................................................4

*McCarthy v. Nw. Airlines, Inc.*,
  56 F.3d 313 (1st Cir. 1995) ........................................................................17

*McCullen v. Coakley*,
  573 U.S. 464 (2014) ........................................................................... 40, 43

*McInnis-Misenor v. Me. Med. Ctr.*,
  319 F.3d 63 (1st Cir. 2003) ........................................................................18

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent*,
  466 U.S. 789 (1984) ...................................................................... 40, 43, 44

*Miranda v. Arizona*,
  384 U.S. 436 (1966) ....................................................................................39

*Rando v. Leonard*,
  826 F.3d 553 (1st Cir. 2016) .......................................................................33

*Renne v. Geary*,
  501 U.S. 312 (1991) ....................................................................................25

*Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*,
  199 F.3d 26 (1st Cir. 1999) .......................................................... 14, 18, 19

*Rideout v. Gardner*,
  838 F.3d 65 (1st Cir. 2016) ............................................................ 3, 31, 41

*Roman Catholic Bishop of Springfield v. City of Springfield*,
  724 F.3d 78 (1st Cir. 2013) ........................................................................18

*Seals v. McBee*,
  898 F.3d 587 (5th Cir. 2018) *as revised* (Aug. 9, 2018) .........................22

*Showtime Entertainment, LLC v. Town of Mendon*,
  769 F.3d 61 (1st Cir. 2014) ................................................................ 31, 32

*Sindicato Puertorriqueno de Trabajadores v. Fortuno*,
  699 F.3d 1 (1st Cir. 2012) .................................................................passim

*State of Rhode Island v. Narragansett Indian Tribe*,
  19 F.3d 685 (1st Cir. 1994) ............................................................... 19, 24

*Sullivan v. City of Augusta*,
  511 F.3d 16 (1st Cir. 2007) ............................................................... 19, 20

*Susan B. Anthony List v. Driehaus,*
 134 S. Ct. 2334 (2014) ................................................................19

*Swearson v. Meyers,*
 455 F. Supp. 88 (D. Kan. 1978) ..................................................48

*Texas v. United States,*
 523 U.S. 296 (1998) ....................................................................25

*Turner v. Lieutenant Driver,*
 848 F.3d 678 (5th Cir. 2017) ................................................ 29, 30

*United States v. Grace,*
 461 U.S. 171 (1983) ....................................................................31

*United States v. Slade,*
 980 F.2d 27 (1st Cir. 1992) ........................................................33

*Valentin v. Hosp. Bella Vista,*
 254 F.3d 358 (1st Cir. 2001) ......................................................17

## STATUTES

28 U.S.C. § 1291 ...............................................................................6

28 U.S.C. §§ 1331, 1343 and 2201 *et seq.* .......................................5

42 U.S.C. §§ 1983 and 1988 ..............................................................5

Mass. Gen. Laws Chapter 272 § 99 ...................................................1

Mass. Gen. Laws Chapter 272 § 99(B)(4)& (C)(1) ...........................7

## OTHER AUTHORITIES

Ashley Southall, *Daniel Pantaleo, officer who held Eric Garner in chokehold, is
 fired*, N.Y. Times (Aug 19, 2019), *available at*
 https://www.nytimes.com/2019/08/19/nyregion/daniel-pantaleo-
 fired.html .............................................................................28

Chloé Cooper Jones, *Ramsey Orta filmed the killing of Eric Garner, so the police
 punished him* The Verge (March 13, 2019), *available at*
 https://www.theverge.com/2019/3/13/18253848/eric-garner-
 footage-ramsey-orta-police-brutality-killing-safety .......................28

Free Thought Project, *Graphic video shows cops let K9 maul unconscious man,*
YouTube (Apr. 8, 2015) *available at*
https:www.youtube.com/watch?v=dEe6IECjXh0&feature=youtu.be. ...................41

*I can't breathe, Eric Garner put in a chokehold by NYPD officer – Video,* The
Guardian (Dec. 4, 2014), *available at*
https://www.theguardian.com/us-news/video/2014/dec/04/i-cant-
breathe-eric-garner-chokehold-death-video .................................................1

Interim Report of the Special Commission on Electronic Eavesdropping
*available at*
https://archives.lib.state.ma.us/bitstream/handle/2452/278637/oc
m39986874-1967-SB-1198.pdf?sequence=1&isAllowed=y ....................................7, 8

Jamie Lynch, *Cops fined after videos surfaced of them punching and kicking
motorist,* CNN (Apr. 14, 2017) *available at*
https://www.cnn.com/2017/04/14/us/georgia-gwinnett-county-
officers-fired-video-trnd/index.html ...............................................28

Jack Metzler, *Cleaning up quotations,* 18 Journal of Appellate Practice and
Process 143 (2017) ...............................................................17

Meridith Edwards and Dakin Andone, *Ex-South Carolina cop Michael Slager
gets 20 years Walter Scott Killing,* CNN (Dec. 7, 2017) *available at*
https://www.cnn.com/2017/12/07/us/michael-slager-
sentencing/index.html ...........................................................28

Mitch Smith, *Video of police killing of Philando Castile is publicly released,* The
New York Times (June 20, 2017) *available at*
https://www.nytimes.com/2017/06/20/us/police-shooting-castile-
trial-video.html .................................................................1

The New York Times (April 7, 2015) (civilian recording of Officer
Michael Slager firing eight rounds into the back of Walter Scott),
*available at*
https://www.nytimes.com/2015/04/08/us/south-carolina-officer-
is-charged-with-murder-in-black-mans-death.html .................................1

Washington Post National Police Shootings Database a*vailable at*
https://www.washingtonpost.com/graphics/national/police-
shootings/ ......................................................................35

Dist. Atty. Memo for Summary Judgement, ECF 114 ....................................33

Fed. R. Civ. P. 56(a) ...........................................................................................17

Order of the Court, Doc. 00117470899 (July 31, 2019).....................................................13

# INTRODUCTION

The right to record police officers "in the discharge of their duties in a public space is a basic, vital and well-established liberty safeguarded by the First Amendment." *Glik v. Cunniffe*, 655 F.3d 78, 85 (1st Cir. 2011). It can also change the country. A recording of a police officer can make the difference between a bare allegation, easily ignored or disbelieved, and a haunting record of misconduct that can alter the public's understanding of race and policing. We can all hear the devastating last words of Eric Garner—"I can't breathe"—only because a member of the public recorded Garner's fatal encounter with members of the New York City Police Department.[1]

Yet, in Massachusetts, the exercise of this important right is restricted. State law makes it a crime to record oral communications in "secret," that is, without the knowledge of the person being recorded. Mass. Gen. Laws ch. 272 § 99 (Section 99).

---

[1] *See, e.g., I can't breathe, Eric Garner put in a chokehold by NYPD officer – Video*, The Guardian (Dec. 4, 2014), *available at* https://www.theguardian.com/us-news/video/2014/dec/04/i-cant-breathe-eric-garner-chokehold-death-video [hereinafter "*I can't breathe – Video*"]; *see also Video shows fatal police shooting – Video,* The New York Times (April 7, 2015) (civilian recording of Officer Michael Slager firing eight rounds into the back of Walter Scott), *available at* https://www.nytimes.com/2015/04/08/us/south-carolina-officer-is-charged-with-murder-in-black-mans-death.html; Mitch Smith, *Video of police killing of Philando Castile is publicly released*, The New York Times (June 20, 2017) (dash-cam recording of Officer Jeronimo Yanez shooting Philando Castile seven times seconds after Mr. Castile alerted the officer to his licensed firearm and stated that he was not pulling his gun out), *available at* https://www.nytimes.com/2017/06/20/us/police-shooting-castile-trial-video.html

This law has no exceptions, not even for recordings of police officers performing their duties in public spaces. Such recordings are therefore automatically illegal, even if the person doing the secret recording fears retaliation from the officer being recorded. And this prohibition is hardly academic. In Boston, the Police Department has repeatedly sought, and the Suffolk County District Attorney has repeatedly pursued, charges against people for secretly recording police officers in public.

Rather than subject themselves to arrest and prosecution, plaintiffs Eric Martin and René Pérez, two activists who have openly recorded police officers, and who want to do so secretly, filed this lawsuit against the Boston Police Department and the Suffolk County District Attorney. They claim that, as applied to their desired secret recordings of police officers performing their duties in public spaces, Section 99 violates the First Amendment. The district court agreed. Granting summary judgment to plaintiffs Martin and Pérez, the district court held that "secret audio recording" of "law enforcement officers performing their duties in public is protected by the First Amendment," and that "because Section 99 fails intermediate scrutiny when applied to such conduct, it is unconstitutional under those circumstances." A. 649.

This decision is correct. *Glik* concluded that the Constitution "unambiguously" protects the right to record police officers performing their duties in public spaces because it "fits comfortably within" bedrock First Amendment principles. 655 F.3d at 82. In so doing, this Court drew no First Amendment distinctions between open and secret recordings. To the contrary, in recognizing Glik's right to record an arrest in

public, the Court held that when such a recording "does not interfere with the police officers' performance of their duties," it "*is not reasonably subject to limitation*." *Id.* at 84 (emphasis added). But the challenged application of Section 99 is a profound limitation of that right; it prohibits all secret audio recording of police officers performing their duties in public. This content-neutral restriction of protected expression is subject to intermediate scrutiny, a test that requires the government to demonstrate that the restriction is narrowly tailored to a substantial government interest. *Jean v. Mass. State Police*, 492 F.3d 24, 29 (1st Cir. 2007); *Rideout v. Gardner*, 838 F.3d 65, 71-72 (1st Cir. 2016). Yet the government has *no interest*, let alone a substantial one, in preventing members of the public from making accurate recordings of police officers performing their duties in public. Indeed, mentioning the police only twice in her First Amendment analysis, the Suffolk County District Attorney does not even argue that the government has an interest in protecting police officers from secret recordings of their performance of duties in public spaces. DA Op. Br. 42, 44. Section 99's prohibition of that expressive conduct is therefore plainly unconstitutional.

Nevertheless, the District Attorney makes two arguments in an effort to upend the decision below. Neither has merit.

First, the District Attorney claims that this lawsuit is not ripe because plaintiffs Martin and Pérez lack a "present intention" to secretly record police officers right now, *while it is still illegal to do so under Section 99*. DA Op. Br. 14, 16. But the law does

3

not require individuals to violate a law just to find out whether a court will agree that it violates the First Amendment. Rather, a First Amendment claim is ripe where, as here, the record establishes an intent to engage in the challenged conduct and a reasonable fear of enforcement. *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 9 (1st Cir. 2012). Martin and Pérez have shown that they want to record police officers in secret but do not presently intend to act on that wish simply because it is illegal. A. 853, 1045-1049, 1051, 1078-1082, 1132, 1360, 1452. And, throughout this litigation, neither the Boston Police Department (which has not appealed) nor the Suffolk County District Attorney have disavowed enforcing Section 99 against the secret recording of police officers performing their duties in public. *Martin v. Evans*, 241 F. Supp. 3d 276, 283 (D. Mass. 2017). The Boston Police Department has already sought charges against at least eight people for this conduct since 2011. A. 1189-1204, 1302, 1314-1327. To have a justiciable claim, plaintiffs Martin and Pérez need not become the 9th and 10th.

Second, the District Attorney launches a glancing defense of Section 99. She argues that this Court should turn aside plaintiffs' as-applied challenge *not* because of any government interest in prohibiting secret recordings of police officers performing their duties in public, but instead due to an altogether different interest in protecting the awareness of *third parties* who speak to or near police officers in public spaces. DA Op. Br. 42, 46. But there are two problems with this argument. The first is that the record does not establish any such interest. If someone is in public and speaking

within earshot of the police, they are already aware that the police could listen to, use, and share their words. It is unclear why the government has an interest in making that same person aware that a civilian could be recording those same words. Indeed, the record below does not identify people who, while in public, wanted to be made aware that they were being recorded while being arrested, stopped, or frisked, or otherwise involved with the police. The second problem is that, even assuming the existence of this government interest with respect to *members of the public*, Section 99's prohibition against secretly recording *police officers* would not be remotely tailored to it. For example, Martin and Pérez wish to secretly record their own interactions with the police, which they cannot do so long as Section 99 continues to criminalize this behavior. A. 1045-1046, 1051, 1078-1079, 1360. That prohibition does not plausibly serve the District Attorney's asserted interest in third parties.

Because Section 99 impermissibly restricts plaintiffs' First Amendment right to record police officers performing their duties in public spaces, and because the record indisputably demonstrates plaintiffs' desire to exercise that right, this Court should affirm the district court's grant of summary judgment to plaintiffs Martin and Pérez.

## JURISDICTIONAL STATEMENT

Plaintiffs Martin and Pérez brought federal claims under 42 U.S.C. §§ 1983 and 1988 for violations of the First and Fourteenth Amendments to the U.S. Constitution. A. 0739. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1343 and 2201 *et seq*. That court entered a final judgment in Mr. Martin and Mr. Pérez's favor on

May 22, 2019, which the District Attorney timely appealed on June 21, 2019. A. 735-36. This court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.     Section 99 prohibits secretly recording police officers performing their duties in public spaces, *Commonwealth v. Hyde*, 434 Mass. 594, 595 750 N.E.2d 963, 966 (2001), and both the Boston Police Department and Suffolk County District Attorney's Office have declined to disavow enforcement of Section 99 against this conduct. Plaintiffs Martin and Pérez collectively detailed more than a dozen instances when they wanted to secretly record police officers performing their duties in public spaces, and the district court found that, but for Section 99, they intended to do just that. Was the district court correct to rule that plaintiffs' pre-enforcement claim is ripe?

2.     This Court has held that the First Amendment "unambiguously" protects the "right to videotape police carrying out their duties in public," and that the "peaceful recording of an arrest in a public space that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation." *Glik,* 655 F.3d at 82, 84. In Massachusetts, however, Section 99 prohibits all secret recording of police officers carrying out their duties in public spaces. Did the district court correctly rule that this application of Section 99 violates the First Amendment because it is not narrowly tailored to a significant government interest and fails to provide adequate alternative modes of communication?

# STATEMENT OF THE CASE

## I.    Statement of facts

### A.    Section 99 entirely prohibits secretly recording police officers performing their duties in public spaces, and no justification for that prohibition appears in the law or its legislative history.

Section 99 imposes up to five years' incarceration on "any person who willfully commits an interception, [or] attempts to commit an interception" of any "communication," where "interception" means "to secretly hear, secretly record, or aid another to secretly hear or secretly record." Mass. Gen. Laws ch. 272 § 99(B)(4)& (C)(1). This ban contains no exemption for secretly recording police officers performing their duties in public. *Hyde*, 434 Mass. at 595, 750 N.E.2d at 966.

Nevertheless, neither Section 99's text nor its legislative history purports to identify a reason for prohibiting secret audio recordings of police officers doing their jobs in public. Before Section 99's enactment, a legislatively-created Special Commission on Electronic Eavesdropping released two reports that formed the basis for the legislation. *See* A.1454-1466; Interim Report of the Special Commission on Electronic Eavesdropping, S. Rep. No. 1198 (April, 1967) ("1967 Report").[2] Although the reports express concern about the recording of communications by telephone

---

*Available at*
https://archives.lib.state.ma.us/bitstream/handle/2452/278637/ocm39986874-1967-SB-1198.pdf?sequence=1&isAllowed=y

companies and *by* police officers, neither articulates a concern about recordings *of* police officers. *See* A.1454-1466; 1967 Report.

>  **B.  The Boston Police Department and the Suffolk County District Attorney's training and practice enforces Section 99 against individuals who secretly record police officers performing their duties in public spaces.**

Law enforcement officials have trained their employees to enforce Section 99 against individuals who secretly record police officers performing their duties in public spaces. The Boston Police Department's training materials on Section 99 includes a video, a training bulletin and a section in the primary criminal law textbook for recruits. A. 1350, 1311-1313, 1328-1337. These training materials all provide examples instructing officers they may arrest and charge someone who secretly records police officers performing their duties in public. A. 1350, 1311-1313, 1328-1337. They do not provide any examples of an individual secretly recording a civilian interacting with or near a police officer. A. 1350, 1311-1313, 1328-1337.

Law enforcement practice reflects this training, as officials have arrested and prosecuted numerous individuals for secretly recording police officers performing their duties in public. Between 2011 and 2018, the Boston Police Department applied for criminal complaints on Section 99 charges against at least eight individuals for secretly recording police officers performing their duties in public, and during that same timeframe the Suffolk County District Attorney proceeded past arraignment for at least four individuals on such charges. A. 1189-1204, 1302, 1314-1327, 1139, 1141-

1144. None of these criminal complaints listed a civilian as a "victim" of the wiretap violation. A. 1189-1204, 1302, 1314-1327, 1139-1144. Instead, if the records identify a victim, they identify the Commonwealth of Massachusetts or a police officer. A. 1160-1161, 1164-1164, 1202, 1206, 1210-1211, 1314. During this litigation, both the Boston Police Department and the District Attorney have been clear that "they do not disavow enforcement of Section 99 against persons like plaintiffs." *Martin*, 241 F. Supp. 3d at 283.

C. **But for Section 99, plaintiffs Martin and Pérez would secretly record police officers performing their duties in public spaces.**

Martin and Pérez each want to secretly record police officers performing their duties in public, and the only thing stopping them is the very real prospect of arrest and prosecution under Section 99. A. 853, 1051, 1360, 1452. As the district court found, "plaintiffs have attested to their prior recordings of police officers," "aver that they desire to secretly record police officers but have refrained from doing so because of Section 99," and "intend to secretly record police if not for Section 99." A. 662, 674. Although Martin and Pérez can't predict the exact moments that they will want to record in the future, they each know these moments will occur based on their years of experience openly recording police officers. A. 1051, 1109-1111, 1131, 1133, 1135, 1359.

Martin has been in numerous situations where he wanted to secretly record police officers performing their duties in public because he was scared that the

9

officers "might react violently or punish me if I took out my phone to openly record them." A. 1045-1046. This fear is born out of his personal experiences with recording officers openly. In one such experience, the officer "tried to knock the phone out of his hand" and "grabbed" his hand so hard that it sprained his wrist. A. 1050. He described the pain in his wrist as similar to "an alligator bit[ing] an antelope's leg and then just yank[ing] it back and forth." A. 1121. In others, officers have "focused their attention on him" and made comments that he found "intimidating" when he openly recorded them. A. 1050. He has also wanted to secretly record police officers performing their duties when he thought "the police officers would alter their behavior and responses if [he] openly recorded them." A. 1047-1048. However, he has refrained from undertaking this secret recording because it is not legal under Section 99, A. 853, 1045-1049, and does not intend to do so "while it is illegal." A. 863.[3]

Pérez has also wanted to secretly record police officers performing their duties in public in situations where he was "afraid" that open recording "might make the police officer angry," or "that the police officer may react violently or scream at me or retaliate against me." A. 1078. As with Martin, Pérez's desire to engage in secret recording stems from his prior experiences with openly recording police officers. In one instance, the police officer yelled at him and grabbed his recording device. A.

_____

[3] Mr. Martin moved to New York City August 2019, although he still returns frequently to Boston to visit his family and friends.

1083. In another, a Chicago police officer hit him twice with a baton when he was openly recording a protest. A. 1083. He has also wanted to secretly record police officers performing their duties in public when he wanted to "more accurately capture the police officer's interactions." A. 1079. He has refrained from doing so, however, due to his concern that he will be arrested or prosecuted under Section 99 and "will not do so until the Court affirms that it is legal." A. 1078-1082, A. 1360. He "would plan to secretly record the police in instances of it being legal to do so." A. 1452.[4]

## II.   Procedural history

On June 30, 2016, Martin and Pérez sued the Boston Police Department and the Suffolk County District Attorney to challenge the constitutionality of Section 99 as applied to the secret recording of police officers performing their duties in public spaces. The lawsuit alleged that Martin and Pérez had been unlawfully prevented from engaging in this activity due to a credible fear that doing so would subject them to arrest and prosecution. A. 737-738.

---

[4] The District Attorney's description of the record evidence concerning the scenarios in which Martin and Pérez want to secretly record is sometimes incorrect or incomplete. For example, the District Attorney states that plaintiffs want to secretly record "conversations that involve a plainclothes officer," DA Op. Br. 14, 16, but both Martin and Pérez stated that they would want to do so when the officer identified themselves as a police officer on duty. A. 882, 947. In addition, Pérez did not "decline[] to rule out" a desire to secretly record a conversation that "appears to be confidential," "discloses personal identifying information," or where he "denies he is making a recording." DA Op. Br. 15-16. Instead, he simply stated "I don't know" or "I have no idea" in response to unbounded and hypothetical questions which were properly objected to as to form. A. 948-949.

In March 2017, the district court denied the defendants' motions to dismiss. *Id.* After a year of discovery, the parties all moved for summary judgment. A. 729-30, 776-78, 1001-03. The District Attorney also moved to dismiss the case on the grounds of ripeness. A. 729, 774-75.

On December 10, 2018, the district court granted summary judgment to Martin and Pérez. It first concluded that their claim was ripe. A. 673-675. The court reasoned that both Martin and Pérez had "attested to their prior recordings of police officers," and had "aver[red] that they desire to secretly record police officers but have refrained from doing so because of Section 99." A. 673-674. At the same time, the court noted that "defendants have sought criminal complaints or charged persons for violating Section 99 numerous times since 2011," and that "the government has not disavowed enforcement of Section 99." A. 674. It concluded that "[t]hese facts g[a]ve rise to a live controversy over genuine First Amendment injuries." A. 674.

Next, the court held that the Boston Police Department could be held liable under *Monell* for a municipal policy because its training materials "communicate that it is permissible to arrest for secretly audio-recording the police under all circumstances," which gave a "green light" to arrests that "are barred by *Glik*." A. 668.

Turning to the merits, the court granted summary judgment to the plaintiffs on their First Amendment claim. The court reasoned that "Section 99 is not narrowly tailored to protect a significant government interest when applied to law enforcement

officials discharging their duties in a public place." A. 683. For that reason, the court "declare[d] Section 99 unconstitutional insofar as it prohibits audio recording of government officials, including law enforcement officers, performing their duties in public spaces, subject to reasonable time, place and manner restrictions" and asked the parties for proposed injunctive language A. 689-690.

On May 22, 2019, the district court issued a final declaratory judgment, while also concluding that no injunction would be necessary to give it effect. A. 707. However, noting that its previous declaration tracked the language of *Glik*, the district court denied the District Attorney's request to narrow it, declaring once again: "Section 99 [is] unconstitutional insofar as it prohibits the secret audio recording of government officials, including law enforcement officers, performing their duties in public spaces. This prohibition is subject to reasonable time, place and manner restrictions." A. 715. This appeal followed. A. 1524.[5]

## SUMMARY OF ARUGMENT

This Court should affirm the district court's grant of summary judgment to plaintiffs Martin and Pérez.

I.    The district court correctly held that plaintiffs' claim is ripe. In the First Amendment context, ripeness requires at most an intent to engage in the challenged

---

[5] The Boston Police Department did not appeal the ruling. This Court consolidated this case with another brought by Project Veritas for briefing, argument and decision. Order of the Court, Doc. 00117470899 (July 31, 2019).

behavior, a step towards that behavior, and a reasonable fear of enforcement. *Sindicato*, 699 F.3d at 9; *Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 33 (1st Cir. 1999). Plaintiffs easily satisfy this standard. Martin and Pérez testified that they want to secretly record police officers performing their duties in public spaces and identified more than a dozen instances when they wanted to record officers in secret. A. 853, 1045-1049, 1051, 1078-1082, 1360, 1452. They have taken steps toward being able to do so, including bringing this lawsuit so that it can become possible to act on their desire without fear of arrest and prosecution. A. 1051, 1359-1360. And their present fear of enforcement is reasonable; the Boston Police Department and the Suffolk County District Attorney have both refused to disavow enforcement of Section 99 against individuals who secretly record police officers performing their duties in public, and have actively pursued charges against individuals who have engaged in such conduct. *Martin,* 241 F. Supp. 3d at 283; A. 1189-1204, 1302, 1314-1327, 1139, 1141-1144. Thus, but for Section 99, Martin and Pérez already would have secretly recorded police officers performing their duties in public spaces, and would do so in the future. Ripeness doctrine requires nothing more.

The District Attorney's contrary argument, which contends that Martin and Pérez's claim is not ripe because they lack a "present intention" to secretly record the police while it is still illegal subverts the reasons why pre-enforcement challenges exist. Plaintiffs need not risk arrest and prosecution, nor predict exactly when they will

secretly record police officers after this case is resolved, in order to present a claim that is properly before this Court.

II.     The district court correctly ruled in favor of Martin and Pérez on the merits of their First Amendment claim. The First Amendment "unambiguously" protects the right to record police officers performing their duties in public spaces, which serves a "cardinal First Amendment interest" in police accountability. *Glik*, 655 F.3d at 82. This right has not been, and should not be, limited to recordings that are undertaken openly. As a result, Section 99's content-neutral prohibition of all secret recordings of police officers performing their duties in public spaces is subject to intermediate scrutiny. This test requires the District Attorney to demonstrate that Section 99's prohibition against secretly recording police officers performing their duties in public spaces is narrowly tailored to a significant government interest and preserves adequate alternative methods of expression.

The district court properly concluded that the District Attorney did not make this showing. With respect to a significant interest, the government should have an interest in *encouraging* members of the public to create accurate records of what police officers say in public when they think no one is recording them. The District Attorney does not claim otherwise. She asserts no argument regarding an interest to protect the privacy of police officers in public. Instead, she asserts a government interest in ensuring that third parties are aware of being recorded when they speak to or near

police officers in public. But the record does not support the District Attorney's assertion that this interest exists.

Even if the District Attorney could demonstrate the existence of this purported government interest with respect to third parties, she could not show that Section 99's blanket prohibition against secretly recording police officers is narrowly tailored to that interest. Many secret recordings of police officers present no possibility of capturing the voices of third parties, and when third parties are in the vicinity, the police officers can protect their interests in other ways. Section 99's ban is especially problematic because it leaves no alternative methods of expression that are as powerful as audio recordings. Such recordings have a "self-authenticating character" which "makes it highly unlikely that other methods could be considered reasonably adequate substitutes." *American Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 607 (7th Cir. 2012). As a result, the district court correctly determined that Section 99 is unconstitutional as applied to the secret audio recording of police officers performing their duties in public spaces.

## ARGUMENT

### I.    Standard of review

This Court reviews *de novo* the district court's determinations that Martin and Pérez's claim is ripe and that they are entitled to summary judgment.  *Labor Relations Division of Construction Industries of Massachuestts, Inc. v. Healey*, 844 F.3d 318, 327 (1st Cir. 2016); *Giguere v. Port Resources, Inc.,* 927 F.3d 43, 47 (1st Cir. 2019). To overcome a

motion to dismiss on ripeness grounds, plaintiffs "must state a claim to relief that is plausible on its face." *Labor Relations Division*, 844 F.3d at 326 (cleaned up).[6] In a challenge to the sufficiency of a ripeness demonstration, the Court "must credit the plaintiff's well-pleaded factual allegations" and draw all reasonable inferences from them. *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001). Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where the parties cross-move, the Court "view[s] each motion separately, drawing all inferences in favor of the nonmoving party." *Giguere*, 927 F.3d at 47 (cleaned up). Where, as here, "the summary judgment target bears the ultimate burden of proof," it "cannot rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." *McCarthy v. Nw. Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir. 1995). Under these standards, Martin and Pérez's claim is ripe and they are entitled to summary judgment.

---

[6] "This brief uses (cleaned up) to indicate that internal quotation marks, alterations or citations have been omitted from quotations." Jack Metzler, *Use (cleaned up) to make your legal writing easier to read,* (Oct. 3, 2017), Before the Bar, abaforlawstudents.com/2017/10/03/use-cleaned-up-make-legal-writing-easier-to-read/; *see also* Jack Metzler, *Cleaning up quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

## II. Plaintiffs' claim is ripe because they have shown an intent to engage in prohibited conduct, a step in furtherance of that intent, and a reasonable fear of enforcement.

The "basic function" of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Whitehouse*, 199 F.3d at 33. The disagreement between plaintiffs—who wish to secretly record police performing their duties in public spaces and have identified more than a dozen specific instances when they previously wanted to do so—and the District Attorney—who has refused to disavow enforcement against such behavior—is anything but abstract. This case is therefore ripe.

### A. The standard for ripeness in a First Amendment declaratory judgment action turns on a reasonable fear of enforcement.

There are two ripeness components: fitness and hardship. *See, e.g., Sindicato*, 699 F.3d at 8. Fitness asks "whether there is a sufficiently live case or controversy, at the time of the proceedings, to create jurisdiction in the federal courts," and "whether resolution of the dispute should be postponed in the name of judicial restraint from unnecessary decision of constitutional issues," whereas hardship "looks at whether the challenged action creates a direct and immediate dilemma for the parties." *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 89-90 (1st Cir. 2013) (cleaned up). A strong showing on one can overcome a weaker showing on the other. *McInnis-Misenor v. Me. Med. Ctr.,* 319 F.3d 63, 70 (1st Cir. 2003).

The fitness analysis is especially flexible in declaratory judgment actions and free speech cases. One can provide only so many details about an action that, by definition, has not yet occurred. *State of Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 692-693 (1st Cir. 1994). And "when free speech is at issue, concerns over chilling effect call for a relaxation of ripeness requirements." *Sullivan v. City of Augusta*, 511 F.3d 16, 31 (1st Cir. 2007). As a result, ripeness in the First Amendment context at most requires an intent to engage in the challenged behavior, a step towards that behavior, and a reasonable fear of enforcement. *Sindicato*, 699 F.3d at 9; *Whitehouse*, 199 F.3d at 33.

For example, in *Alvarez*, the Seventh Circuit held that the plaintiffs had brought a justiciable pre-enforcement challenge to the Illinois Wiretap Statute as applied to the audio recording of police officers performing their duties in public. 679 F.3d at 590-595.[7] Attempting to distinguish that case, the District Attorney here claims that *Alvarez* was justiciable "based on a plan proposed by the plaintiff," DA Op. Br. 28, but that "plan" was in fact quite general. The plaintiffs did not—and could not— predict *who* or *what* they would record. *Alvarez*, 679 F.3d at 593. It was sufficient that (1) "the organization intend[ed] to use its employees and agents to audio record on-duty police officers in public places," (2) "[t]he ACLU claim[ed] a First Amendment

---

[7] Because standing and ripeness in pre-enforcement cases "boil down to the same question," *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 n.5 (2014), this response uses standing precedent to enhance its understanding of the ripeness question. *See, e.g., Sindicato*, 699 F.3d at 9 n.5.

right to undertake this recording, but the eavesdropping statute prohibit[ed] it from doing so," and (3) "the ACLU itself, and certainly its employees and agents" would "face prosecution for violating the statute." *Id.* "Nothing more is needed for pre-enforcement standing." *Id.*

## B. Plaintiffs' First Amendment claim for a declaratory judgment is ripe.

As the district court properly recognized, the undisputed record makes clear that Martin and Pérez have "done enough to show a reasonable predictability of enforcement sufficient to satisfy the relaxed ripeness standard applicable to the present case." *Sindicato*, 699 F.3d at 9.

To begin, plaintiffs established that, but for Section 99, they would secretly record the police performing their duties in public. Based on the undisputed record, the district court correctly found that "the plaintiffs intended to secretly record police if not for Section 99." A. 661-662; *see also* A. 672-673. Martin and Pérez testified that they want to secretly record police officer performing their duties in public without fear of arrest and prosecution, listed more than a dozen specific instance in which they previously wanted to secretly record police officers performing their duties in public, and provided dozens of videos where they have openly recorded the police. A. 1045-1049, 1051, 1078-1082, 1345-1349, 1360; *cf. Sullivan*, 511 F.3d at 31 (testimony that plaintiff was previously chilled from applying for parade permit after the 30-day advance notice requirement demonstrates ripeness). As Pérez explained, "I would

plan to secretly record the police in instances of it being legal to do so." A. 1452.

Plaintiffs detailed that they are often too scared to openly record police officers, due to experiences with police officers who physically or verbally retaliated against them when they engaged in open recording. A. 1049-1050, 1082-1083. Plaintiffs also demonstrated that they have taken concrete steps toward secretly record police officers in public spaces, including bringing this lawsuit to vindicate their right to make secret recordings, taking their phones whenever they leave the house, and placing a shortcut for recording on their phone's homepage so that it is easier to access. A. 1051, 1359-1360.

What is more, Martin and Pérez have demonstrated that they face a credible threat of prosecution for secretly recording the police. The Boston Police Department has arrested people for that behavior; the Suffolk County District Attorney has pursued the arraignment of individuals charged with such behavior; and throughout this litigation neither defendant has disavowed applying Section 99 to this behavior. *Martin*, 241 F. Supp. 3d at 283; A. 674, A. 1189-1204, 1302, 1314-1327, 1139, 1141-1144. In addition, the district court held that the Boston Police Department had a municipal policy of training police officers that they could arrest individuals for secretly recording police officers performing their duties in public spaces. A. 668-669. This determination was not appealed.

Finally, chilling First Amendment expression is an "irretrievable loss" that typically satisfies the hardship prong of ripeness. *Sindicato*, 699 F.3d at 9; *see also* A. 673

(noting "the hardship prong is not disputed here"). Given the sliding scale on which this Court evaluates ripeness, even if Martin and Pérez did not have a strong showing on fitness—though they do—the grave damage to their First Amendment rights would mean that their claim is still ripe. *See Sindicato*, 699 F.3d at 9.[8]

### C. The District Attorney's ripeness argument misapprehends the record and the law.

In an argument that nowhere mentions the district court's ripeness analysis for Martin and Pérez, the District Attorney insists that their claim is unripe due to a supposed "lack of concrete facts." DA Op. Br. at 21; *compare* DA Op. Br. at 31-32 (District Attorney's discussion of district court's ripeness ruling with respect to Project Veritas) *with* A. 673-675 (district court's ripeness ruling with respect to plaintiffs Martin and Pérez). This is not so.

The District Attorney's argument repeatedly relies on a claim that plaintiffs Martin and Pérez have "no present intention" to secretly record a police officer. DA Op. Br. 14, 16, 21 *see also* DA Op. Br. 32. But this is wordplay. A plaintiff in a pre-enforcement case typically lacks a "present intention" to violate the challenged law simply because the plaintiff does not intend to violate the law *unless* a court first deems it unconstitutional. Courts "do not require" that "plaintiffs bet the farm" to vindicate their fundamental First Amendment rights. *Seals v. McBee*, 898 F.3d 587, 592 (5th Cir.

---

[8] The District Attorney is therefore wrong to suggest the district court should not have considered these fundamental First Amendment injuries in its ripeness analysis. DA Op. Br. at 32 n.10.

2018) *as revised* (Aug. 9, 2018) (cleaned up). Here, the record establishes that, *but for Section 99*, plaintiffs would already have secretly recorded police officers performing their duties in public, and that they would do so in the future. A. 853, 855, 862-863, 1045-1049, 1051, 1078-1082, 1360, 1452. Ripeness doctrine requires nothing more.

In a similar vein, the District Attorney contends that plaintiffs' repeated and sworn desire to record police officers in secret fails to establish the "who, what, where, when, and how," of what they want to record. DA Op. Br. 32. But Martin and Pérez *have* answered each of these questions, attesting that they want to record police officers (who), performing their duties (what), in public spaces (where), when it is legal to do so (when) secretly (how). A. 1051, 1360. Because those intended actions are manifestly prohibited by Section 99, nothing more is required to create a ripe case and controversy about whether Section 99 is unconstitutional as applied to secretly recording police officers performing their duties in public spaces. The District Attorney's own merits argument reveals that this case will not depend on the particular circumstance of a given secret recording. She broadly defends the challenged application of Section 99 on the notion that "the only way" to protect the Commonwealth's interest "in assuring that citizens are aware of when they are being recorded" is to impose a wholesale requirement "that recording be done openly." DA Op. Br. 49. While this argument demonstrates a disagreement about whether Martin and Pérez's as-applied challenge to Section 99 should succeed, it also removes any doubt that this question is properly before this Court.

Even if this Court wanted additional details, Martin and Pérez have provided far more facts than the District Attorney acknowledges. Martin has listed nine specific occurrences, falling into roughly five factual categories, in which he has wanted to secretly record police officers performing their duties in the past. A. 1045-1049. For example, he wanted to secretly record a group of police officers who stopped him when he was on his own on the street at night in the spring of 2011 to accurately document their behavior because he was afraid it would escalate the situation if he took out his phone to record them. A. 1045-1046. Pérez listed ten specific occurrences, falling into roughly six factual categories. A. 1078-1082. For example, he wanted to secretly record a police officer who pulled him over when he was driving on his own in Boston a few years ago to accurately document the police officer's interaction with him because he was afraid openly recording might cause the police officer to react violently. A. 1078. These occurrences necessarily shed meaningful light on the situations in which plaintiffs would secretly record police officers performing their duties in public spaces when it is legal to do so.

It is true that plaintiffs cannot now name the "particular place" or "particular thing" they will secretly record in the future. DA Op. Br. 32. But "[p]re-enforcement suits always involve a degree of uncertainty about future events." *Alvarez*, 679 F.3d at 594; *see also Narragansett* 19 F.3d at 692 (noting ripeness evaluated differently in declaratory judgment actions because they involve "an ex ante determination of right")(cleaned up). Plaintiffs do not even know the year in which this litigation will be

resolved, so they can hardly be faulted for failing to detail the secret recordings they will make when that happens. Their undisputed allegation that they want to engage in this prohibited behavior in the future is sufficient. *See Act Now to Stop War and End Racism Coalition and Muslim American Society Freedom Foundation v. District of Columbia*, 846 F.3d 391, 401-02 (D.C. Cir. 2017); *281 Care Committee v. Arneson*, 638 F.3d 621, 629-32 (8th Cir. 2011).

The District Attorney cites several cases to argue "courts regularly forbear where a plaintiff, as here, seeks an abstract ruling." DA Op. Br. 34-35. But those cases have no bearing where, as here, plaintiffs bring a First Amendment claim in the face of a credible threat of enforcement.

Three of the District Attorney's cases involve a voting rights claim, a statutory interpretation claim, and a takings claim, respectively, none of which trigger the special ripeness considerations at issue in First Amendment cases. *Cf. Texas v. United States*, 523 U.S. 296 (1998) (voting rights); *In re the Financial Oversight and Management Board for Puerto Rico*, 916 F.3d 98, 111-12 (1st Cir. 2019)(statutory interpretation); *In re the Financial Oversight and Management Board for Puerto Rico*, 919 F.3d 638, 647 (1st Cir. 2019)(takings). And the record of repeated applications for criminal complaints and prosecutions under Section 99 and the governments' refusal to disavow enforcement against plaintiffs sets this case apart from the District Attorney's First Amendment citations, each of which lacked a credible threat of enforcement. *See Renne v. Geary*, 501 U.S. 312, 323 (1991) (statute had never been applied in the manner suggested by

plaintiffs, and there was nothing to suggest it would be when the state court had yet to interpret the unclear statute); *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 304 (1979) (challenge to provision stipulating that employers need not furnish facilities for labor organizations not justiciable because "it [was] conjectural to anticipate that access will be denied); *Kines v. Day*, 754 F.2d 28, 31 (1st Cir. 1985) (plaintiff did not allege any chilling of constitutionally-protected behavior from a credible threat of enforcement, and there was no indication that such a threat would ever arise).[9]

### III. As applied to the secret recording of police officers performing their duties in public spaces, Section 99 violates the First Amendment because it is not narrowly tailored to a significant government interest and does not preserve adequate alternatives.

The "fundamental and virtually self-evident" right to record police officers performing their duties in public spaces serves "cardinal First Amendment interest[s]," including, and perhaps especially, police accountability. *Glik*, 655 F.3d at 82, 85. As applied to the secret recording of police officers performing their duties in public spaces, Section 99 violates this right because it is not narrowly tailored to a significant government interest and does not preserve adequate alternatives.

---

[9] In *Kines,* the incarcerated plaintiff who brought an as-applied challenge to MCI-Walpole's rule to only admit books sent directly from publishers—which explicitly included an exception when the Superintendent approved the book to enter via a visit—had never made a request for Superintendent approval. 754 F.2d at 31.

## A. This case implicates an important First Amendment right.

The First Amendment right to gather and disseminate information about police officers performing their duties in public is profoundly important and clearly established. *Glik*, 655 F.3d at 82. Police officers can "command citizens, take them into custody, and . . . use physical force against them." *Hyde*, 434 Mass. at 613, 750 N.E.2d at 976 (Marshall, C.J., dissenting). Consequently, "[c]itizens have a particularly important role to play when the official conduct at issue is that of the police," which cannot be performed if they "fear criminal reprisals when they seek to hold government officials responsible by recording—secretly recording on occasion—an interaction between a citizen and a police officer." *Id.* at 612, 976 (Marshall, C.J., dissenting). Plaintiffs' experiences reflect this reality. Martin wanted to secretly record a "heavily armed" police officer who "had a gun in his hand and [was] wearing what appeared to be SWAT gear" directly outside of his car window during a traffic stop because he "didn't feel safe taking out [his] phone to openly record." A. 1046-1047. Instead, he didn't record at all. A. 1047. Pérez wanted to secretly record a police officer who was forcing two protesters to leave at the end of a march because he was afraid the police officer "might react violently or scream at [him]." A. 1079. When he instead openly recorded the police officer, the officer got "very upset," "grabbed" his device and "stopped the recording." A. 1130.

The right of members of the public to create these recordings has proved to be a key tool for police accountability. For example, a judge sentenced Officer Michael

Slager to 20 years in federal prison two years after a recording captured him firing eight rounds at Walter Scott's back.[10] "Five years after Mr. Garner's dying words" were caught on video, the New York Police Department fired the officer whose chokehold killed him.[11] And "two police officers in Georgia were fired [] less than 24 hours after cell phone videos surfaced of them punching and kicking" Demetrius Hollins while he was in handcuffs.[12]  Recordings are often the only way to achieve such accountability. As the Christopher Commission established to examine police misconduct in the wake of the Rodney King beating admitted, it is "doubtful" there ever "would have been a Los Angeles Police Department investigation" without a recording "since the efforts of King's brother to file a complaint were frustrated and the report of the involved officers was falsified." *Hyde*, 434 Mass. at 606, 750 N.E.2d

---

[10] Meridith Edwards and Dakin Andone, *Ex-South Carolina caop Michael Slager gets 20 years for Walter Scott Killing,* CNN (Dec. 7, 2017) *available at* https://www.cnn.com/2017/12/07/us/michael-slager-sentencing/index.html

[11] Ashley Southall, *Daniel Pantaleo, officer who held Eric Garner in chokehold, is fired*, N.Y. Times, (Aug 19, 2019), *available at* https://www.nytimes.com/2019/08/19/nyregion/daniel-pantaleo-fired.html. Ramsey Orta, who recorded Eric Garner's death, has since been sentenced to a four-year term in prison, during which time he has said he has been threatened, harassed, beaten, poisoned and placed in solitary confinement in retaliation for his video. Chloé Cooper Jones, *Ramsey Orta filmed the killing of Eric Garner, so the police punished him*, The Verge (March 13, 2019), *available at* https://www.theverge.com/2019/3/13/18253848/eric-garner-footage-ramsey-orta-police-brutality-killing-safety. A police officer at his arraignment told the Daily News "he took the video, now we took the video." *Id.*

[12] Jamie Lynch, *Cops fined after videos surfaced of them punching and kicking motorist,* CNN (Apr. 14, 2017) *available at* https://www.cnn.com/2017/04/14/us/georgia-gwinnett-county-officers-fired-video-trnd/index.html

at 972 (Marshall, C.J., dissenting) (quoting Report of the Independent Commission on the Los Angeles Police Department at ii (1991)).

Neither these important interests, nor this Court's recognition of the First Amendment protection they receive, are limited to recordings that are undertaken openly. Here, the District Attorney repeatedly asserts that *Glik* confirmed only a "right to openly record," a phrase that appears *nowhere* in the *Glik* opinion. DA Op. Br. 6, 21, 26-27. In fact, this Court's First Amendment analysis in *Glik* did not mention, let alone turn on, a distinction between open and secret recording. The Court instead recognized a right to record police officers "in the discharge of their duties in a public space," *Glik*, 655 F.3d at 85, a pronouncement that, by its own terms, does not hinge on open recording any more than it hinges on whether the recording takes place on a Tuesday.[13]

Other courts have mirrored *Glik*'s acknowledgement of the right to record without distinguishing between open and secret recording. For example, the Fifth Circuit held that "First Amendment principles, controlling authority, and persuasive precedent demonstrate that a First Amendment right to record the police does exist, subject only to reasonable time, place and manner restrictions." *Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017); *see also id.* at 690 ("We agree with every

---

[13] The absence of such a distinction in the Court's First Amendment holding seems both significant and intentional, given that the Court's *Fourth Amendment* analysis mentioned the open nature of the recording for the limited purpose of ruling out that there was probable cause to arrest Mr. Glik under Section 99. *Glik*, 655 F.3d at 87-88.

circuit that has ruled on this question: Each has concluded that the First Amendment protects the right to record the police.").[14]  What is more, the District Attorney is incorrect that "the decision below is the first in the country to recognize a First Amendment 'right to surreptitiously record.'" DA Op. Br. 29 In *State of New Hampshire v. Valentin*, a New Hampshire trial court held "the Court finds that the First Amendment protects secretly filming police in public, for the same reasons that the First Amendment generally protects filming the police." ADD. 5 (Dckt. No. 216-2015-CR-766, unpub op., (Oct. 21, 2015, N. H. Sup. Ct.)); *see also Bacon v. McKeithen*, No. 5:14-cv-37, 2014 WL 12479640, *4 (N.D. Fl. Aug. 28, 2014) (construing state wiretap statute to allow secret recordings of police officers performing their duties in public because "any contrary construction would raise serious constitutional issues as to its validity as an unreasonable restriction on constitutionally protected speech").

Because the First Amendment right recognized in *Glik* encompasses all recordings of police officers performing their duties in public spaces, the relevant question is whether Section 99's complete prohibition of such recordings when they are done in secret satisfies the requisite First Amendment test. As described below, it cannot.

---

[14] Although *Turner* concluded that the officers were entitled to qualified immunity because the right was not clearly established in the Fifth Circuit at the time of the recording, it went on to hold that the right was "clearly established henceforth." *Id.* at 687-688.

## B. Intermediate scrutiny applies to Martin and Pérez's claim.

"Section 99 is a content-neutral law of general applicability." *Jean v. Mass. State Police,* 492 F.3d 24, 29 (1st Cir. 2007) (cleaned up). Such "[c]ontent-neutral restrictions are subject to intermediate scrutiny." *Rideout v. Gardner,* 838 F.3d 65, 71 (1st Cir. 2016). As a result, the district court properly used intermediate scrutiny to analyze Section 99's complete prohibition of the secret recording of police officers, A. 680-681, thereby following this Court's directive that the right to record police officers performing their duties in public spaces is only "subject to reasonable time, place, and manner restrictions," *Glik,* 655 F.3d at 84.

Notably, intermediate scrutiny is the appropriate test regardless of whether this lawsuit is deemed an as-applied challenge (as plaintiffs contend) or a facial challenge (as defendants contend). Because plaintiffs challenge Section 99's application to the secret recording of police officers performing their duties in public spaces, this case is properly understood as an as-applied claim. *See United States v. Grace*, 461 U.S. 171 (1983) (analyzing and declaring statutory prohibition of displaying banners on Supreme Court grounds unconstitutional as applied to public sidewalks). But even if this case "does not fit neatly within [the] traditional concept" of either facial or as-applied challenges, plaintiffs bringing such mixed claims must only satisfy standards "for a facial challenge to the extent of th[e] reach" of their claim. *Showtime Entertainment, LLC v. Town of Mendon,* 769 F.3d 61, 70 (1st Cir. 2014) (cleaned up); *see also John Doe No. 1 v. Reed,* 561 U.S. 186, 194 (2010) (same). This means a court must

apply the relevant constitutional test—here, intermediate scrutiny—to the applications contemplated by plaintiffs' claims—here, the prohibition of secretly recording police officers performing their duties in public spaces—to determine if the challenged regulation has a plainly legitimate sweep. *Showtime*, 769 F.3d at 70-78 (applying intermediate scrutiny to analyze mixed as-applied/facial claim that the application of the zoning bylaws to adult entertainment businesses violated the First Amendment).

Contrary to the District Attorney's argument that "plainly legitimate sweep" is a necessary incantation, DA Op. Br. 38, that phrase is "not [] a separate test applicable to facial challenges, but a description of the outcome of a facial challenge in which a statute fails to satisfy the appropriate constitutional framework." *Cf. Doe v. City of Albuqurque*, 667 F.3d 1111, 1123 (10th Cir. 2012) (describing meaning of the related "no set of circumstances" language); *Bruni v. City of Pittsburgh*, 824 F.3d 353, 363 (3rd Cir. 2016) (same). Nor does that phrase remove the government's burden of proof within the applicable constitutional framework, as the District Attorney further claims. *Cf.* DA Op. Br. 22, 28; *Showtime*, 769 F.3d at 76 (requiring the Town of Mendon to put forward evidence that the challenged bylaws actually furthered its government interest); *Doe*, 667 F.3d at 1131 (holding within the context of a mixed as-applied/facial claim that the "[c]ity has the burden of proof" for the intermediate scrutiny test); *Bruni*, 824 F.3d at 369 (same). In the context of a mixed as-applied/facial claim, *Showtime* analyzed whether the government had satisfied its burden under intermediate scrutiny to determine whether the challenged application

of the statute had a "plainly legitimate sweep." 769 F.3d at 70-78. This Court should

do so again here.

Finally, the District Attorney now argues that intermediate scrutiny does not

apply to "the entire scope of the plaintiffs' claims." DA Op. Br. 22; *see also* DA Op.

Br. 39-42. This argument was waived below, where the District Attorney suggested in

a footnote only that a lower standard "might" apply. Dist. Atty. Memo for Summary

Judgement, ECF 114 at 20 n.4. As the district court recognized, the District Attorney

"d[id] not convincingly develop this argument, and neither *Glik* nor *Jean* supports it."

A. 681. "[P]erfunctory arguments" before the district court "are insufficient to

preserve [an] argument on appeal." *Rando v. Leonard*, 826 F.3d 553, 557 (1st Cir.

2016).[15] And even if this argument had been preserved, it would be unsuccessful,

since *Glik* already indicated that intermediate scrutiny should apply to the regulation

of recording police officers in public spaces. 655 F.3d at 83-84 (noting the First

Amendment right to record police officers in public spaces "may be subject to time,

place, and manner restrictions").[16] Because plaintiffs Martin and Pérez's as-applied

claim challenges just such a regulation, intermediate scrutiny must apply.

---

[15] The District Attorney's "observ[ation]" that Section 99 could be analyzed as a
regulation of conduct subject to a lesser standard of review–appearing in footnotes
both before the district court and this Court–is similarly waived. DA Op. Br. 41 n.12;
*United States v. Slade*, 980 F.2d 27, 30 (1st Cir. 1992) ("Passing allusions are not
adequate to preserve an argument in either a trial or an appellate venue.").
[16] While plaintiffs requested remedy encompasses public spaces that are generally
accessible to the public without permission, in the alternative they at least seek relief
for recordings on the streets, sidewalks, public parks, and other public grounds. *See*

### C. Section 99, as applied to recordings of police officers performing their duties in public spaces, cannot survive intermediate scrutiny.

Under intermediate scrutiny, the District Attorney must demonstrate that

Section 99's prohibition against secretly recording police officers performing their

duties in public is narrowly tailored to a significant government interest and preserves

adequate alternative channels of communication. To satisfy this standard, the District

Attorney must "do more than simply posit the existence of the disease sought to be

cured" and provide actual evidence to support her arguments. *Asociacion de Educacion*

*Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 18 (1st Cir. 2007) (cleaned up).

The District Attorney does not do so.

### (i) Section 99's prohibition against secretly recording police officers performing their duties in public spaces is not supported by a significant government interest.

Establishing a significant government requires identifying harms that are "real,

not merely conjectural.'" *Id.* at 18 (quoting *Turner Brod Sys., Inc. v. FCC*, 512 U.S. 662,

665 (1994)). In this case it is unclear that there is *any* legitimate government interest,

let alone a significant one, in preventing members of the public from making audio

recordings of police officers performing their duties in public.

If anything, the government would seem to have a significant interest in

*promoting* the creation of accurate records of what police officers say in public when

---

ECF 156 at 3 n3. Rollins does not dispute that intermediate scrutiny applies to such traditional and designated fora. DA Op. Br. 40.

they think no one is recording them. Police officers are "granted substantial discretion that may be misused to deprive individuals of their liberties," *Glik,* 655 F.3d at 82, or to use violence against civilians, *see, e.g.,* Washington Post National Police Shootings Database (637 people fatally shot by police in 2019 as of September 18, 2019; 992 people fatally shot by police in 2018).[17] Given this great power, "'public confidence in the police is a social necessity and is enhanced by procedures that deter [unlawful police conduct].'" *Hyde*, 434 Mass. At 613, 750 N.E.2d at 976 (alteration in original) (quoting *O'Connor v. Police Com'r of Boston*, 408 Mass 324, 328-29, 557 N.W.2d 1146, 1150 (1990)) (Marshall, C.J., dissenting). Secret recordings of police officers in public spaces are just such a mechanism, as they allow civilians to create self-authenticating records of police behavior when they are too afraid to do so openly, often because of the exact misconduct they wish to document. It is in everyone's interest—the Commonwealth's and civilians'—to capture accurate recordings of these actions, even and sometimes especially if those recordings also document civilian voices.[18]

Indeed, the District Attorney does not argue that the government has any interest in protecting *police officers* from secret audio recordings in public spaces. Neither the legislative history of Section 99, nor the record in this case, supports the existence of any such harm to police officers. And, consistent with its decision not to appeal the decision below, the Boston Police Department has recognized that "police

---

[17] *Available at* https://www.washingtonpost.com/graphics/national/police-shootings/
[18] *See, e.g., I can't breathe – Video, supra* n. 1.

officers have no expectation of privacy when performing their duties in public." City of Boston's Opp. to Plaintiff's Mtn. for Prelim. Injunc., at 17 n.8, *Boston Police Patrolman's Association v. City of Boston*, No. 16-cv-02670, (Super. Ct. Suffolk County Sept. 6, 2016); *see also Glik*, 655 F.3d at 84; *Martin*, 241 F.Supp.3d at 287.

Instead, the District Attorney posits that the relevant government interest in this case is not the prevention of secret recording of police officers, but rather an asserted interest in ensuring that members of the public are "aware of when they are being recorded" when they speak to or near police officers in public. DA Op. Br. 42. The District Attorney imagines that this interest could arise in certain particularized scenarios, such as a police meeting with a confidential informant in a park, or a police encounter with a victim or witness to a crime on the street. DA Op. Br. 46.

The record does not indicate that this asserted interest exists, or that these scenarios are even plausible. Because the First Amendment right at issue here involves recording police officers performing their duties *in public*, any government interest in protecting third parties would by definition involve third parties who are speaking to or near the police *in public and within earshot of the would-be recorder*. It is unclear why the police would ever conduct sensitive discussions with informants, witnesses, or victims under these circumstances. And, unsurprisingly, there is no record evidence that they do. After a year of discovery, the District Attorney was unable to provide any evidence that police officers speak with confidential informants, victims or witnesses about sensitive issues in public spaces, or provide examples of police officers

36

interacting with confidential informants, victims or witnesses in public spaces who wanted to be made aware of any recording of their interaction. A. 1147-1149, 1151, 1273-1274, 1286-1287.[19] This record is consistent with the Seventh Circuit's observation that "[p]olice discussions about matters of national and local security do take place in public where bystanders are within earshot." *Alvarez*, 679 F.3d at 607.

To the contrary, the record shows that the Boston Police Department's training materials on Section 99 focus exclusively on arresting people for secretly recording *police officers*, without providing a single example of arresting someone for secretly recording *a third party* interacting with a police officer performing his duties in public. A. 1350, 1311-1313, 1328-1337. Likewise, of the at least eight applications for criminal complaints filed by the Boston Police Department against individuals for secretly recording police officers performing their duties in public between 2011 and 2018, not a single application or corresponding police report mentions any concerns about nearby third parties. A. 1189-1204, 1302, 1314-1327. Thus, the record does not establish that the District Attorney's asserted government interest in protecting third parties is "real and not merely conjectural." *Garcia-Padilla*, 490 F.3d at 18.

---

[19] The District Attorney's 30b6 witness—designated to testify to the existence of any harms caused by the secret recording of police officers performing their duties in public spaces and any supporting evidence of such harms—did not even identify civilian awareness as a potential government interest. A. 1147, 1149. She then testified that she was unable to provide any facts, studies, surveys or data to show that prohibiting the secret recording of police officers performing their duties in public spaces helped protect against any harms. A. 1148-1149, 1151.

This Court "cannot conclude that [the Commonwealth] has a legitimate state interest in fixing a problem it has not shown to exist." *Garcilla-Padilla*, 490 F.3d at 18. But even if there were evidence that any of these hypothetical interactions occurred in public spaces with a civilian-expectation of notification, the District Attorney could not demonstrate that the government's interest in protecting this awareness is significant. *Cf. Jean*, 492 F.3d at 30 (holding "the interest in protecting private communication" "is virtually irrelevant [] where the intercepted communications involve a search by police officers of a private citizen's home in front of that individual, his wife, other members of the family, and at least 8 law enforcement officers").[20] The District Attorney argues civilians need to be made aware they are being recorded to protect "the vibrancy of our public spaces" and the expectation that "one may count on the obscurity of his remarks" based on "the likelihood that the listener will either overlook or forget what is said." DA Op. Br. 47-48. But these policy arguments have no meaning within the context of civilian interactions *with police officers*. Interactions with police officers during an arrest, stop-and-frisk, or crime-report do not contribute to a vibrant market place of ideas, and no one assumes that a police officer will forget what is said to them.

---

[20] Although *Jean* involved a "nanny cam" installed by the arrested private civilian in his home, the Court did not suggest that any of the family members whose communications were also recorded during the arrest were aware of its existence.

Finally, the District Attorney argues that the unwilling listener doctrine "establish[s] the significance of the Commonwealth's interest in assuring that its citizens are aware of when they are being recorded." DA Op. Br. 42-43. However, these decisions—which have never been applied to the right to record—involved individuals who had no choice but to receive the information and emphasized an expectation of privacy in the invaded spaces. *See, e.g., Hill v. Colorado,* 530 U.S. 703, 717-18 (2000) (explaining the unwilling listener experiences a "degree of captivity" that "makes it impractical for [them] to avoid exposure," noting "the right to avoid unwelcome speech has special force in the privacy of the home and its immediate surroundings," and extending similar protection to medical facilities) (cleaned up); *Frisby v. Schultz,* 487 U.S. 474, 486-88 (1988) (explaining the unwilling listener is "trapped" and "cannot avoid the objectionable speech," and upholding ban of picketing targeted to a specific household because it "inherently and offensively intrudes on residential privacy"); *Kovacs v. Cooper,* 336 U.S. 77, 87 (1949) (explaining the unwilling listener "is practically helpless to escape this interference" "in his home or on the street"). That doctrine has no bearing here, where any recorded individual *voluntarily chose to speak*, and there is no expectation of privacy when talking with or around a police officer in a public space. To the contrary, a police officer can share or use anything that they hear, and the expectation is that they will, in fact, do so. *Cf. Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). The district court was therefore correct to conclude that the unwilling listener line of cases is not applicable. A. 682.

**(ii)** **Section 99's prohibition of secretly recording police officers performing their duties in public spaces is not narrowly tailored to the purported government interest in civilian awareness.**

Narrow tailoring "demand[s] a close fit between ends and means," and requires the government to prove "that alternative measures that burden substantially less speech would fail to achieve the government's interests." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014); *see also Garcia-Padilla*, 490 F.3d at 16 (effect must be "no greater than necessary" to protect the government's interests). Although a "complete ban" of protected expression "*can* be narrowly tailored," that is "*only if* each activity within the proscription's scope is an appropriately targeted evil." *Frisby*, 487 U.S. at 485 (emphasis added). Section 99's complete prohibition of the secret recording of police officers performing their duties in public does not meet this stringent standard.[21] Instead, as the district court concluded, even if the District Attorney could

---

[21] *Compare with Frisby,* 487 U.S. at 477, 483 (upholding a complete ban on picketing "before or about" any residence to protect individuals from harassment by construing the ban to prohibit only "focused picketing taking place solely in front of a particular residence" and to continue to authorize "[g]eneral marching through residential neighborhoods, or even walking a route in front of an entire block of houses"); *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984) (upholding complete ban of political posters on public property to reduce visual blight when ordinance did not prevent speaking or distributing literature); *Globe Newspapers Co. v. Beacon Hill Architectural Com'n*, 100 F.3d 175, 190 (1st Cir. 1996) (upholding a complete ban on news racks only when the government's actions "including survey[s], report[s] and public hearing—demonstrate that it carefully calculated the costs and benefits" and that its chosen path was "the most effective solution aimed at reducing visual clutter and preserving the District's historic character").

demonstrate a significant government interest in protecting the awareness of third parties who speak to or near police officers in public, she could not show Section 99's prohibition against secretly recording police officers is narrowly tailored to that interest. A. 686. *Cf. Garcilla-Padilla*, 490 F.3d at 18; *Rideout*, 838 F.3d at 74. This is so for two reasons.

*First*, Section 99 bans secret recordings of police officers that do not present even the theoretical prospect of capturing oral communications by third parties. These include: (1) situations where the recorder is subject to a police action and is the only person present who is not a police officer; (2) traffic stops and other interactions where everyone subject to the police action knows that an individual is recording it, and the police officer does not; and (3) situations where someone records a police officer's interaction with a civilian who does not or cannot speak. The last can occur when a civilian records a police officer assaulting an unconscious third party.[22] These are exactly the kinds of scenarios in which someone would want to secretly record police officers either for safety reasons or to document unvarnished police behavior. None of these scenarios present a risk of secretly recording a civilian's speech. Yet the challenged application of Section 99 proscribes all of them.

---

[22] *See, e.g.,* The Free Thought Project, *Graphic video shows cops let K9 maul unconscious man,* YouTube (Apr. 8, 2015) *available at* https:www.youtube.com/watch?v=dEe6IECjXh0&feature=youtu.be.

The record below demonstrates that these scenarios are commonplace. Plaintiffs Martin and Pérez have wanted to secretly record police officers performing their duties in public in one-on-one interactions during traffic and pedestrian stops. A. 1045-1049, 1078-1082. And the Boston Police Department trains its officers with materials that describe applying Section 99 to a situation where a lone individual secretly records police officers during a traffic stop. A. 1311-1313, 1328-1347, 1350. The District Attorney cannot demonstrate that the challenged application of Section 99 is "no greater than necessary" to protect civilian awareness given the wide-range of prohibited recordings that do not and cannot possibly implicate such concerns.

*Second*, even within the narrow band of scenarios in which the government wishes to make civilians aware they are being recorded while speaking within earshot of a police officer performing their duties in public, it has other tools available. For starters, when the police speak with informants or crime victims about sensitive issues, they can move to a nonpublic place. The absence of any evidence during discovery in this case that these discussions occur in public suggests that the police may already be doing this.[23] In addition, any potential government interest in protecting civilian awareness could be vindicated by prosecuting, at most, the secret recording of *the civilian*—not the secret recording of *the officer*. There is, therefore,

---

[23] If the danger to the civilian is the very fact that they are speaking with the police officer, it is the public nature of the discussion, not any recording, that poses a safety risk.

simply no justification for Section 99's blanket prohibition against secretly recording police officers. *See, e.g., McCullen*, 573 U.S. at 493-494 (buffer zone is not narrowly tailored where "the Commonwealth has available to it a variety of approaches that appear capable of serving its interests" without burdening constitutionally protected speech); *Cutting v. City of Portland*, 802 F.3d 79, 91-92 (1st Cir. 2015)(city ordinance's "sweeping ban" against standing on city medians not narrowly tailored where "the City did not try—or adequately explain why it did not try—other, less speech restrictive means of addressing the safety concerns it identified").

**(iii)   Section 99's prohibition of secretly recording police officers performing their duties in public spaces does not preserve adequate alternative avenues of expression.**

Although "the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places," "a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate." *Vincent*, 466 U.S. at 812. That is the case here. The District Attorney argues that Section 99's complete prohibition on secret recording preserves two purportedly adequate alternatives: (1) methods of information-collection that do not involve audio recording, including visual recording or writing, and (2) open recording. DA Op. Br. 52-53. Neither is sufficient.

Regarding the first, as the district court rightly noted, audio recording is a "uniquely reliable and powerful method[] of preserving and disseminating news and information about events that occur in public," whose "self-authenticating character

makes it highly unlikely that other methods could be considered reasonably adequate substitutes." *Alvarez*, 679 F.3d at 607; A.686-687 (same). Without audio, the world would not have heard Eric Garner's 11-times repeated "I can't breathe" or Philando Castile calmly agreeing not to pull out his gun a mere 13 seconds before he was shot seven times. "Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting the free discussion of governmental affairs." *Glik*, 655 F.3d at 82 (cleaned up). "This is particularly true of law enforcement officials[.]" *Id.* Audio recording is thus a "uniquely valuable [and] important mode of communication" with no adequate alternative. *Vincent*, 466 U.S. at 812.

With respect to the second, the record demonstrates that open recording often is not a viable option for individuals who fear police retaliation. Plaintiffs testified that in many situations, they do not feel safe openly recording police officers performing their duties in public based on their prior experiences. A. 1045-1050, 1078-1083. For example, a police officer grabbed Martin's hand, ultimately spraining his wrist and fingers, when he saw Martin openly recording him in Jamaica Plain. A. 1050, 1112-1123, 1346. When the officer let go of Martin's hand, Martin didn't know if he was going to reach for his baton or mace or gun, and it was "one of the scariest moments of [his] life." A. 1050, 1117-1118. Pérez has also had experiences where police aggressively responded to his open recordings. A. 1082-1083. For example, an officer struck Pérez twice with his baton when he was openly recording police during a

protest in Chicago, which caused his phone to stop recording and left Pérez with bruises. A. 1083, 1129, 1349. In Boston, an officer yelled at Pérez and grabbed the recording device when he saw that Pérez was openly recording him. A. 1079, 1083, 1129-1130, 1348. Pérez was "terrified," and "left very shaken." A. 1130. As a result of these experiences, in certain situations Martin and Pérez are too afraid to openly record police officers performing their duties in public. A. 1049-1050, A. 1082-1083. In such circumstances, Section 99's prohibition of secret recording means that they cannot exercise their right to record at all.

### D. Because the challenged application of Section 99 does not survive intermediate scrutiny, it is unconstitutionally preventing Martin and Pérez from secretly recording police officers performing their duties in public spaces.

Because Martin and Pérez's claim differs from that of Project Veritas, it is important to be clear about what it would mean to affirm the district court's declaratory judgment in their favor, specifically with respect to *where* and *to what conduct* the declaration should apply.

First, the district court correctly determined that Section 99 unconstitutionally prohibits the secret audio recording of police officers performing their duties in *public spaces*. A. 689. The court's reference to "public spaces" was not a failure to define the scope of relief, as the District Attorney argues, DA Op. Br. 19-20, but rather a direct tracking of this Court's holding in *Glik*, which consistently used the term "public

spaces" to describe the scope of the First Amendment protections.[24] That *Glik* did so alongside its explicit acknowledgment that the Boston Common was a "public forum," *Glik,* F.3d at 84, indicates that the phrase "public spaces" encompasses *more* than a "traditional or designated public forum." So too does its reference to *Iacobucci v. Boulter*, 193 F.3d 14 (1st Cir. 1999)—which involved recording government officials "in the hallway outside a public meeting"—as an example of where the First Circuit has "previously recognized that the videotaping of public officials is an exercise of First Amendment liberties." *Glik*, 655 F.3d at 83. Consequently, the district court correctly refused to limit "public space" to traditional and designated public fora because that would be "narrower than the plain language of *Glik*." A. 714.[25]

Second, the district court correctly ruled that Section 99 is unconstitutional, as applied to secret audio recording of police officers performing their duties in public

---

[24] *See, e.g., Glik*, 655 F.3d at 83 ("[T]he First Amendment protects the filming of government officials in *public spaces* [.]") (emphasis added); *id.* at 84 ("Such peaceful recording of an arrest in a *public space* that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation.") (emphasis added); *id.* at 84-85 (referring to *Iacobucci* and "other circuit opinions that have recognized a right to film government officials or matters of public interest in *public space*") (emphasis added); *id.* at 85 ("In summary, though not unqualified, a citizen's right to film government officials, including law enforcement officers, in the discharge of their duties in a *public space* is a basic, vital and well-established liberty safeguarded by the First Amendment.") (emphasis added).

[25] If this Court disagrees, it should at the very least hold that Section 99 is unconstitutional as applied to secretly recording police officers performing their duties in traditional and designated public forums. The record demonstrates that plaintiffs have wanted to secretly record police officers performing their duties in traditional and designated public, but have refrained from doing so because of Section 99. A. 853, 1045-1049, 1051, 1078-1082, 1360, 1452.

spaces, even in situations where the recording also captures oral communications by a third party. A. 714. Consistent with that ruling, this Court should not only declare unconstitutional arrests and prosecutions premised on Section 99's application to the secret recording of police officers' voices when they are performing their duties in public spaces—which would protect plaintiffs Martin and Pérez from arrest or prosecution when they secretly record police officers during a one-on-one interaction between themselves and the officer, or in situations where other civilians know about the recording—but also insofar as Section 99 applies to the secret recording of a civilian's voice that appears on the same recording. *Glik* is clear that the government cannot "reasonably subject to limitation" the peaceful recording of an arrest in a public space that does not interfere with a police officers' performance of their duties." 655 F.3d at 84. Charging someone who is secretly recording a police officer making a public arrest for secretly recording a civilian's voice at the same time would plainly, and unlawfully, "limit" this kind of recording, in contradiction of that reasoning.[26]

---

[26] The same principles support the conclusion that a peaceful recording of a police officer's physical or verbal altercation with a civilian in a public space that does not interfere with the officer's performance of their duties also cannot reasonably be subject to limitation. The government also has not demonstrated a significant interest in preventing the secret recording of bystanders in such circumstances, particularly as they already can unknowingly be recorded by someone who is openly recording an arrest with their back turned toward them.

This is not to say that every law purporting to limit the secret recording of

individuals who interact with police officers would necessarily be unconstitutional.

But, assuming for the sake of argument that there are significant government interests

in protecting the awareness of people interacting with or within the earshot of police

officers performing their duties in public spaces in specific situations, it is the *legislature*

that should amend Section 99 to craft a law that is narrowly tailored to such interests.

*See Swearson v. Meyers*, 455 F. Supp. 88, 93 (D. Kan. 1978) ("Nor would it be

appropriate for the court to suggest to defendants how the ordinance could be

rewritten so that it might pass constitutional muster."). For example, in *Hague v.*

*Committee for Indus. Org.*, 307 U.S. 496, 518 (1939), the Supreme Court determined that

a city ordinance requiring petitioners to apply for a public meeting permit, which

could be granted or denied at the Director of Safety's discretion, was unconstitutional.

*Id.* Noting that "courts cannot rewrite the ordinance," the Court refused to enumerate

conditions to limits the Director's discretion. *Id.* Instead, the Court held that "[a]s the

ordinance is void, the respondents are entitled to a decree so declaring and an

injunction against its enforcement by the petitioners." *Id.*

This Court should do the same and should declare that Section 99 is

unconstitutional whenever it is applied to someone secretly recording a police officer

performing their duties in public spaces, even if that recording also includes civilian

voices. This would shield expressive conduct that is unquestionably protected by the

First Amendment, while still allowing for the possibility that Section 99 could be

replaced with a narrower law. To the extent significant government interests in making civilians aware they are being recorded when interacting with police officers performing their duties in public spaces actually exist in specific situations—though the District Attorney has not demonstrated they do—this would give the legislature the opportunity to draft a provision in the first instance that is narrowly tailored to such interests if it so chooses.

## CONCLUSION

For the reasons stated above, this Court should affirm the district court's judgment in favor of plaintiffs Martin and Pérez.

Dated: September 27, 2019

Respectfully submitted,

*/s/ Jessie J. Rossman*
Jessie J. Rossman (No. 1161236)
Matthew R. Segal (No. 1151872)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
MASSACHUSETTS
211 Congress Street
Boston, MA 02110
(617) 482-3170
jrossman@aclum.org

– and –

William D. Dalsen (No. 1182437)
PROSKAUER ROSE LLP
One International Place
Boston, MA  02110-2600
Telephone: (617) 526-9600

Facsimile: (617) 526-9899
wdalsen@proskauer.com

*Attorneys for Plaintiffs K. Eric Martin and*
*René Pérez*

**CERTIFICATE OF COMPLIANCE**

I, Jessie Rossman, as counsel for the Appellees Eric Martin and René Pérez, herby certify, pursuant to Fed. R. App. P. 32(a)(7)(C), as follows:

(1) This brief complies with the type-volume limitation established by order of this Court dated July 31, 2019, because it contains 12837 words, exclusive of those parts of the brief exempted by Fed. R. App. P. 32(f).

(2) This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Garamond 14-point type.

*/s/ Jessie J. Rossman*                    Dated: September 27, 2019
Jessie J. Rossman

# CERTIFICATE OF SERVICE

I, Jessie Rossman, herby certify that on September 27, 2019, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. All of the following participants in this case are registered CM/ECF users, so they will be served by the appellate CM/ECF system:

Eric A. Haskell, eric.haskell@mass.gov
Matthew P. Landry, matthew.landry@mass.gov
Randall E. Ravitz, randall.ravitz@mass.gov
Benjamin T. Barr, ben@statecraftlaw.com
Stephen R. Klein, steve@statecraftlaw.com
Daniel J. Kelly, dkelly@mccarter.com

*/s/ Jessie J. Rossman*                    Dated: September 27, 2019
Jessie J. Rossman

# ADDENDUM

# TABLE OF CONTENTS

**Page**

Order Granting Defendant's Motion to Dismiss, State of New
     Hampshire v. Alfredo Valentin, Docket No. 216-2015-CR-766
     (Oct. 21, 2015, N.H. Sup. Ct) ................................................................ ADD-1

**STATE OF NEW HAMPSHIRE**

**HILLSBOROUGH, SS.**
**NORTHERN DISTRICT**

**SUPERIOR COURT**

State of New Hampshire

v.

Alfredo Valentin

Docket No. 216-2015-CR-766

**ORDER**

Defendant, Alfredo Valentin, is charged with Unlawful Interception of Oral Communication under RSA 570-A:2, I-a. He moves to dismiss based on the First Amendment to the U.S. Constitution and insufficiency of the indictment. The Court held a hearing on October 13, 2015. Upon consideration of the pleadings, arguments, and the applicable law, the Court finds and rules as follows.

**Background**

For the purposes of this motion, construing all evidence in the light most favorable to the State, the Court finds the following facts. See State v. Lacasse, 153 N.H. 670, 672 (2006). On March 3, 2015, defendant found Manchester police officers searching his residence. Defendant left his home and returned one to two hours later. Police were still searching his residence. Sergeant Brian LaVeille and Lieutenant Christopher Sanders approached defendant in his driveway and spoke with him. Defendant recorded some of this interaction on his cell phone. The State contends that defendant held the phone by his leg, so as to conceal that he was recording.

VAL0271

ADD-1

The State charged defendant with a misdemeanor wiretapping offense under

RSA 570-A:2, I-a, which provides in relevant part:

[a] person is guilty of a misdemeanor if, except as otherwise specifically provided in this chapter or without consent of all parties to the communication, the person knowingly intercepts a telecommunication or oral communication when the person is a party to the communication.

## Analysis

Defendant argues that the Court must dismiss the charge against him because it

violates the First Amendment. "It is firmly established that the First Amendment

protects a range of conduct surrounding the gathering and dissemination of information"

including "the right of individuals to videotape police officers performing their duties in

public." Gericke v. Begin, 753 F.3d 1, 7 (1st Cir. 2014); see Glik v. Cunniffe, 655 F.3d

78, 83 (1st Cir. 2011) ("[T]he First Amendment protects the filming of governmental

officials in public spaces . . . .").

"Gathering information about government officials in a form that can readily be

disseminated to others serves a cardinal First Amendment interest in protecting and

promoting 'the free discussion of governmental affairs.'" Glik, 655 F.3d at 82 (quoting

Mills v. Alabama, 384 U.S. 214, 218 (1966)).

'[F]reedom of expression has particular significance with respect to government because it is here that the state has a special incentive to repress opposition and often wields a more effective power of suppression.' This is particularly true of law enforcement officials, who are granted substantial discretion that may be misused to deprive individuals of their liberties.

Id. (citations omitted) (quoting First Nat'l Bank v. Belotti, 435 U.S. 765, 777 n.11 (1978)).

"In our society, police officers are expected to endure significant burdens caused by

citizens' exercise of their First Amendment rights." Id. at 84. "The same restraint

demanded of police officers in the face of provocative and challenging speech, must be

ADD-2

expected when they are merely the subject of videotaping that memorializes, without impairing, their work in public spaces." Id. (quotation omitted).

The State does not dispute that defendant filmed police performing their duties in public. Nonetheless, the State argues that the First Amendment does not protect defendant's conduct because defendant concealed the fact that he was recording. The State contends the U.S. Court of Appeals for the First Circuit in Glik and Gericke "found that, in the absence of a statutory exception, the 1st Amendment to the Federal Constitution does not protect an individual who intercepts public officials' oral communications unless . . . the act of recording is done openly." (State's Obj. at 2.) The State further asserts:

> [t]he decision in Glick [sic] turned on the question of the openness of the actor's conduct, that is whether it was readily apparent to the officers whose communications were recorded that the actor was engaged in recording them. The Court determined that, because the Glick's [sic] conduct was open and obvious to the officers . . . his conduct was constitutionally protected.

(Id. at 2–3.)

The State's representation of Glik and Gericke is manifestly incorrect. The question of "openness" did not enter into the First Amendment analysis in either case. In Glik, the plaintiff brought First and Fourth Amendment claims against Massachusetts following an arrest under Massachusetts' wiretap statute for recording police. 655 F.3d at 79. In its First Amendment analysis, the Glik Court wrote, "[i]s there a constitutionally protected right to videotape police carrying out their duties in public? Basic First Amendment principles, along with case law from this and other circuits, answer that question unambiguously in the affirmative." Id. at 82. Glik later suggests that the First Amendment does not protect filming that interferes with police duties. Id. at 84. The

VAL0273                                    3

ADD-3

Court, however, explicitly declined to specify further limitations stating, "[t]o be sure, the right to film is not without limitations. . . . We have no occasion to explore those limitations here, however."   Id. at 84.    Likewise, Gericke allows for reasonable restrictions on the right to record police, but never discusses whether such recordings must be open.  753 F.3d at 8–9.

The question of openness did enter into Glik's Fourth Amendment analysis.  655 F.3d at 86.  In his Fourth Amendment claim, the Glik plaintiff alleged he was arrested for violating Massachusetts' wiretap statute without probable cause.  Id.  Massachusetts' wiretap statute extends only to "secret" recordings, so the Court's Fourth Amendment analysis turned on whether the police had probable cause to believe the plaintiff secretly recorded them.  Id.

The State argues Glik's analysis of whether the recording was secret shows that the First Amendment does not protect secret recordings.  If the First Amendment protects secret recordings, the State argues, there could have been no probable cause to arrest the plaintiff, and so the Court would have had no reason to decide whether the recording was secret.  To the contrary, the fact that a criminal charge violates the First Amendment does not mean that the arrest underlying the charge violates the Fourth Amendment. See Michigan v. DeFillippo, 443 U.S. 31, 38 (1979) ("The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality—with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws."). Thus, the Glik's analysis about whether the recording was secret for Fourth Amendment purposes does not show that secret recordings are beyond the First Amendment's protection.

ADD-4

To the extent the State relies on Commonwealth v. Hyde, 750 N.E.2d 963 (Mass. 2001), to demonstrate that the First Amendment does not protect secret recordings, this reliance is misplaced.  The Massachusetts Supreme Judicial Court in that case upheld the conviction of a defendant under Massachusetts' wiretap statute after he secretly recorded an interaction with police.  Id. at 964.  The defendant's challenge in Hyde was based on statutory interpretation of Massachusetts' wiretap statute.  Id. at 965.  The case did not address the First Amendment.  See id.  Notably, Hyde was decided before Glik and Gericke clarified the First Circuit's position that the First Amendment protects the recording of police officers.

As such, absent contrary authority from the State, the Court finds that the First Amendment protects secretly filming police in public, for the same reasons that the First Amendment generally protects filming police.  The public has the right to gather and disseminate information about the police.  Glik, 655 F.3d at 82.

It is "clearly established . . . that the First Amendment right to film police carrying out duties in public . . . remains unfettered if no reasonable restriction is imposed or in place."  Gericke, 753 F.3d at 8.  "Reasonable restrictions on the exercise of the right to film may be imposed when the circumstances justify them."  Id. at 7–8.  The right to film "may be subject to reasonable time, place, and manner restrictions."  See Glik, 655 F.3d at 84.  However, the State points to no existing restrictions that specifically forbid secretly filming police.  Thus the Court need not consider whether such a restriction would qualify as a reasonable manner restriction.

The First Amendment also does not protect the filming of police that causes legitimate safety concerns or that "interfere[s] with police duties."  Gericke, 753 F.3d at

ADD-5

8.   However, the State points to no specific safety concerns caused by defendant's filming and does not allege defendant's filming interfered with police duties.  The State argues secret filming of police allows confidential information to be recorded without police knowledge and allows criminals to secretly record undercover officers, thereby creating danger to those undercover officers.   However, the State does not allege defendant actually filmed any confidential information or undercover officers.  As such, the conduct for which defendant has been criminally charged is protected by the First Amendment.

Defendant also argues that the charge must be dismissed based on the sufficiency of the indictment.  However, because the charge must be dismissed based on the First Amendment, the Court need not consider the sufficiency of the indictment.

Accordingly, for the foregoing reasons, defendant's motion to dismiss is GRANTED.

**SO ORDERED.**

10/21/15
Date

Gillian L. Abramson
Presiding Justice

6

ADD-6