# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT
_____

Case Nos. 19-1586, 19-1640
_____

PROJECT VERITAS ACTION FUND,

*Plaintiff-Appellee/Cross-Appellant*,

v.

RACHEL S. ROLLINS, IN HER OFFICIAL CAPACITY
AS SUFFOLK COUNTY DISTRICT ATTORNEY,

*Defendant-Appellant/Cross-Appellee*.

_____

Case No. 19-1629
_____

K. ERIC MARTIN & RENÉ PÉREZ,

*Plaintiffs-Appellees,*

v.

RACHAEL S. ROLLINS, IN HER OFFICIAL CAPACITY
AS SUFFOLK COUNTY DISTRICT ATTORNEY,

*Defendant-Appellant,*

WILLIAM G. GROSS, IN HIS OFFICIAL CAPACITY
AS POLICE COMMISSIONER FOR THE CITY OF BOSTON,

*Defendant.*

ON APPEAL FROM JUDGMENTS OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

## BRIEF OF *AMICUS CURIAE* ELECTRONIC FRONTIER FOUNDATION
## IN SUPPORT OF PLAINTIFFS-APPELLEES MARTIN AND PÉREZ
## AND AFFIRMANCE OF THE OPINION BELOW OF DECEMBER 10, 2018

Adam Schwartz
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
adam@eff.org
(415) 436-9333

Sophia Cope, Bar No. 1190340
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
sophia@eff.org
(415) 436-9333

*Counsel for Amicus Curiae ELECTRONIC FRONTIER FOUNDATION*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *Amicus Curiae* Electronic Frontier Foundation states that it does not have a parent corporation and that no publicly held corporation owns 10% or more of its stock.

Dated: October 3, 2019   By: _/s/ Sophia Cope_____
              Sophia Cope

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ............................................................................... iv

STATEMENT OF INTEREST .............................................................................. 1

INTRODUCTION .................................................................................................. 2

ARGUMENT .......................................................................................................... 4

I.  PEOPLE USE POWERFUL TECHNOLOGIES TO RECORD AND
    SHARE AUDIO AND VIDEO .......................................................... 4

    A.  People Record Audio and Video With Ubiquitous Mobile
        Devices .................................................................................... 4

    B.  People Share Audio and Video With Social Media Apps ......... 5

II.  PEOPLE CREATE AND SHARE NEWSWORTHY AUDIO AND
     VIDEO RECORDINGS OF POLICE PERFORMING THEIR
     OFFICIAL DUTIES IN PUBLIC ...................................................... 8

    A.  Audio Recording of Police ...................................................... 8

    B.  Police Retaliation Against Recording ................................... 13

III.  THE FIRST AMENDMENT PROTECTS THE RIGHT TO
      SECRETLY AUDIO RECORD POLICE PERFORMING THEIR
      OFFICIAL DUTIES IN PUBLIC .................................................... 15

    A.  The First Amendment Protects Information Gathering ........... 15

    B.  Recording Police Advances Government Accountability ....... 16

    C.  Audio and Video Recordings Are Inherently Expressive
        Mediums and Thus the First Amendment Protects the
        *Process* of Making Them ....................................................... 18

    D.  The First Amendment Right to Record Police Includes the
        Right to Record Voices .......................................................... 21

      E.     The First Amendment Right to Record Police Includes Doing So Secretly .............................................................................. 22

      F.     Police Recordings Are No Substitute for Civilian Recordings .............................................................................. 23

  IV.   CRIMINALIZING THE SECRET AUDIO RECORDING OF CONVERSATIONS BETWEEN POLICE AND CIVILIANS IN PUBLIC DOES NOT ADVANCE PRIVACY, AND ANY CIVILIAN PRIVCY INTERESTS ARE OUTWEIGHED BY THE PUBLIC INTEREST IN GOVERNMENT ACCOUNTABILITY .................. 25

  V.    THE FIRST AMENDMENT RIGHT TO RECORD IS NOT LIMITED TO POLICE PERFORMING THEIR OFFICIAL DUTIES IN PUBLIC ....................................................................................... 29

CONCLUSION ................................................................................... 31

CERTIFICATE OF COMPLIANCE .................................................... 33

CERTIFICATE OF SERVICE ............................................................. 34

# TABLE OF AUTHORITIES

## Cases

*ACLU of Illinois v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) ................................................................. *passim*

*Anderson v. City of Hermosa Beach*,
621 F.3d 1051 (9th Cir. 2010) ......................................................... 21

*Bartnicki v. Vopper*,
532 U.S. 514 (2001) ........................................................................ 26

*Board of Educ. v. Pico*,
457 U.S. 853 (1982) ........................................................................ 16

*Branzburg v. Hayes*,
408 U.S. 665 (1972) ........................................................................ 15

*Brown v. Entm't Merchants Ass'n*,
564 U.S. 786 (2011) ........................................................................ 20

*Carpenter v. U.S.*,
138 S. Ct. 2206 (2018) ................................................................... 29

*Citizens United v. Federal Election Comm'n*,
558 U.S. 310 (2010) ........................................................................ 19

*Fields v. City of Philadelphia*,
862 F.3d 353 (3rd Cir. 2017) ..........................................17, 18, 22, 24

*First Nat'l Bank of Boston v. Bellotti*,
435 U.S. 765 (1978) ........................................................................ 17

*Fordyce v. City of Seattle*,
55 F.3d 436 (9th Cir. 1995) ............................................................ 22

*Frasier v. Evans*,
No. 19-1015 (10th Cir.) ................................................................... 14

*Gaymon v. Borough of Collingdale*,
150 F. Supp. 3d 457 (E.D. Pa. 2015) .............................................. 30

*Gericke v. Begin*,
    753 F.3d 1 (1st Cir. 2014) ................................................................. 22

*Glik v. Cunniffe*,
    655 F.3d 78 (1st Cir. 2011)..................................................... *passim*

*Haynik v. Zimlich*,
    508 N.E.2d 195 (Ohio Ct. C.P. 1986) ...................................... 28

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*,
    515 U.S. 557 (1995) .................................................................. 18

*J.A. v. Miranda*,
    2017 WL 3840026 (D. Md. 2017) .......................................... 30

*Jean v. Massachusetts State Police*,
    492 F.3d 24 (1st Cir. 2007)....................................................... 30

*Joseph Burstyn, Inc. v. Wilson*,
    343 U.S. 495 (1952) .................................................................. 18

*Kaplan v. California*,
    413 U.S. 115 (1973) .................................................................. 18

*Mills v. Alabama*,
    384 U.S. 214 (1966) .................................................................. 17

*New York Times Co. v. U.S.*,
    403 U.S. 713 (1971) .................................................................. 15

*Packingham v. North Carolina*,
    137 S. Ct. 1730 (2017) ............................................................. 19

*Pleasant Grove City v. Summum*,
    555 U.S. 460 (2009) .................................................................. 19

*Reno v. ACLU*,
    521 U.S. 844 (1997) .................................................................. 19

*Richmond Newspapers, Inc. v. Virginia*,
    448 U.S. 555 (1980) ....................................................15, 16, 17

*Riley v. California*,
573 U.S. 373 (2014) ............................................................ 5

*Schad v. Borough of Mount Ephraim*,
452 U.S. 61 (1981) ........................................................... 18

*Shulman v. Group W Productions, Inc.*,
18 Cal. 4th 200 (1988) ..............................................26, 28, 31

*Smith v. City of Cumming*,
212 F.3d 1332 (11th Cir. 2000) ....................................... 18

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ......................................................... 20

*State of Hawai'i v. Russo*,
141 Hawai'i 181 (2017)..................................................... 22

*Thornhill v. State of Alabama*,
310 U.S. 88 (1940) ........................................................... 17

*Turner v. Lieutenant Driver*,
848 F.3d 678 (5th Cir. 2017) ................................... *passim*

*U.S. v. Stevens*,
559 U.S. 460 (2010) ......................................................... 20

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) ......................................................... 19

*Western Watersheds Project v. Michael*,
869 F.3d 1189 (10th Cir. 2017) ....................................... 20

*Wilkins v. NBC*,
71 Cal. App. 4th 1066 (1999) ........................................... 26

*Wolfson v. Lewis*,
924 F. Supp. 1413 (E.D. Pa. 1996) .................................. 28

## Statutes

18 U.S.C. § 2510(2) ............................................................. 26

Mass. Gen. Laws 272 § 99 ........................................... 2, 26

# Other Authorities

*'I Can't Breath': Eric Garner put in chokehold by NYPD – video*, The Guardian (Dec. 4, 2014) ................................................................................................. 9

Abby Phillip, *Woman who posted video of officer punching a suspect becomes target of Miami police union*, Wash. Post (Aug. 14, 2015) .............................. 13

Andrew Siff, *4 EMS Workers Suspended Without Pay in Chokehold Arrest*, NBC 4 New York (July 21, 2014) .................................................................... 31

Apple, *Take videos with your iPhone camera*, iPhone User Guide .................. 5, 11

Apple, *Use the Voice Memos app* ................................................................... 5, 11

Aundrea Cline-Thomas & Dan Stamm, *Raw Video Shows Heroin Antidote Saving Mother's Life*, NBC 10 Philadelphia (Feb. 12, 2016) ............................ 30

Benjamin Mueller and Ashley Southall, *25,000 march in New York to protest police violence*, N.Y. Times (Dec. 13, 2014) ....................................................... 9

*Black unarmed teen Antwon Rose shot in Pittsburgh*, The Guardian (June 28, 2018) ................................................................................................ 12

Brett Chapman, *Body-worn cameras,* Nat'l Institute of Justice (Nov. 14, 2018) ................................................................................................ 23

Chris Halsne and Chris Koeberl, *Denver Police accused of using excessive force, illegal search*, Fox31 Denver (Nov. 24, 2014) ...................................... 14

Christina Carrega-Woodby, *Police assaulted, arrested Staten Island woman as revenge for filming Eric Garner video: lawsuit*, N.Y. Daily News (July 14, 2015) ................................................................................................ 14

Dan Noyes, *The top 20 valuable Facebook statistics,* Zephoria Digital Marketing (Sept. 2019) ................................................................................................... 7

Deanna Paul and Herman Wong, *After a 4-year-old took a doll from a store, video shows Phoenix police pulling a gun on her parents*, Wash. Post (June 16, 2019) ................................................................................................ 11

Ericsson, *Mobile subscriptions Q1 2019*, Mobility Report (June 2019) .................. 5

Facebook, *Facebook Live* ................................................................................... 7

German Lopez, *Ferguson police arrested protestors after release of Justice Department report*, Vox (March 5, 2015)......................................................... 12

German Lopez, *The failure of police body cameras,* Vox (July 21, 2017) ............ 24

Google, *Create or edit a note*, Google Keep Help ........................................... 5, 11

Google, *Record a video on your Pixel phone*, Google Camera Help................ 5, 11

Instagram, *Our Story* .......................................................................................... 6

Jamel Lanee' and Peter Bernard, *St. Pete officers resigns after using racial slur*, NewsChannel8 (Jun. 12, 2018).......................................................................... 10

Jim Dwyer, *A switch is flipped, and justice listens in*, N.Y. Times (Dec. 8, 2007)................................................................................................... 10

Julie Turkewitz and Richard A. Oppel Jr., *Killing in Washington state offers 'Ferguson' moment for Hispanics*, N.Y. Times (Feb. 16, 2015) ....................... 12

Justin Hicks, *Concerns mount in South Bend after a white police officer kills a Black man*, NPR (June 21, 2019)....................................................................... 23

Kevin Rector and Talia Richman, *Baltimore police officer suspended with pay after viral video shows him punching, tackling man*, Baltimore Sun (Aug. 11, 2018) ................................................................................................. 10

Kit Smith, *52 fascinating and incredible YouTube statistics*, Brandwatch (July 15, 2019) ...................................................................................................... 6

Kyung Lah, *Laquan McDonald shooting: Why did it take 13 months to release video?*, CNN (Dec. 2, 2015) .............................................................................. 24

Laura Anthony, *Rohnert Park officer being sued for drawing gun on man*, ABC 7 News (Aug. 7, 2015) ............................................................................... 14

Marlene Lenthang, *Chicago cop under investigation after he was caught on tape repeatedly hitting a 16-year-old black boy*, Daily Mail (Dec. 4, 2018)............. 14

Mekahlo Medina and Michael Larkin, *New video shows woman arguing with federal agents moments before her phone is smashed*, NBC Los Angeles (April 22, 2015)................................................................................................... 13

Michael S. Schmidt and Matt Apuzzo, *South Carolina officer is charged with murder of Walter Scott*, N.Y. Times (April 7, 2015)............................................ 12

Oliver Laughland, et al., *'We can't breathe': Eric Garner's last words become protesters' rallying cry*, The Guardian (Dec. 4, 2014) ........................................ 9

P.R. Lockhart, *A Baltimore police officer brutally beat a Black man. It's creating new problems for the department*, Vox (Aug. 14, 2018) ...................... 10

Patrick O'Connell and Georgina Gustin, *Officer in trouble over motorist's video in St. George*, St. Louis Post-Dispatch (Sept. 11, 2007).................................... 11

Periscope, *About Us* ......................................................................................... 7

Periscope, *Periscope, by the numbers*................................................................ 7

Pew Research Center*, Mobile Fact Sheet* (June 12, 2019)....................................... 5

Pew Research Center, *The audience for digital news videos* (March 26, 2014) ...... 8

Pew Research Center, *U.S. smartphone use in 2015* (April 1, 2015) ...................... 6

Pew Research Center, *YouTube & News* (July 16, 2012)....................................... 8

Phillip Kennicott, *UC Davis protesters pepper-spraying raises questions about role of police*, Wash. Post (Nov. 20, 2011) ........................................................ 12

Richard Fausset and Ashley Southall, *Video shows officer flipping student in South Carolina, prompting inquiry*, N.Y. Times (Oct. 26, 2015)..................... 12

Robert Mackey, *Images of militarized police in Baton Rouge draw global attention*, The Intercept (July 11, 2016)............................................................ 12

Ryan J. Foley, *AP analysis: Police routinely deny access to officer video footage*, PBS News Hour (March 13, 2019) .................................................... 24

*The Boston Police Department will begin implementing body worn cameras on Monday June 3, 2019*, Boston Police Dept. News (May 31, 2019) .................. 27

*The Facebook video statistics everyone needs to know*, MediaKix (Sept. 18, 2018) ................................................................................................. 7

*The viral video that set a city on fire*, CNN (April 28, 2017)................................ 12

Timothy Williams, et al., *Police body cameras: What do you see?,* N.Y. Times (April 1, 2016).............................................................................. 24

Todd Clarke, *22+ Instagram stats that marketers can't ignore this year*, Hootsuite (March 5, 2019)........................................................................ 6

*TSA detains official from Ron Paul group*, Wash. Times (April 6, 2009) ............. 10

Twitter, *How to create live videos on Twitter* ......................................................7

*Video shows cops letting onlookers taunt suspect*, CBS Chicago (Mar. 23, 2011) ............................................................................................... 11

Zack Kopplin, *Alton Sterling witness: Cops took my phone, my surveillance video, locked me up*, Daily Beast (April 13, 2017)...................................... 13, 14

## STATEMENT OF INTEREST[1]

*Amicus Curiae* Electronic Frontier Foundation (EFF) is a member-supported, non-profit civil liberties organization that works to protect digital liberty. Founded in 1990, EFF has over 30,000 members. EFF has done extensive work to advocate for both values at issue on appeal: government accountability and communications privacy. EFF has filed numerous *amicus* briefs in support of the First Amendment right to record police who are performing their official duties in public. *See, e.g., Fields v. City of Philadelphia*, No. 16-1650 (3d Cir.); *Frasier v. Evans*, No. 19-1015 (10th Cir.). EFF also litigates against government surveillance of private communications,[2] and informs the public how to protect the privacy of their communications.[3] EFF calls upon its experience advocating for both government accountability and communications privacy in concluding that the First Amendment protects the right to secretly audio record police officers performing their official duties in public.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or their counsel has made any monetary contributions intended to fund the preparation or submission of this brief. The parties have consented to the filing of this brief.

[2] *See, e.g.,* https://www.eff.org/nsa-spying.

[3] *See, e.g.,* https://ssd.eff.org/en/module/communicating-others.

**INTRODUCTION**

The First Amendment protects the right to secretly audio record police officers performing their official duties in public. *Amicus* thus respectfully urges this Court to hold that the Massachusetts anti-eavesdropping statute, Mass. Gen. Laws 272 § 99, violates the First Amendment as applied to such recording.

In *Glik v. Cunniffe*, this Court held: "though not unqualified, a citizen's right to film government officials, including law enforcement officers, in the discharge of their duties in a public space is a basic, vital, and well-established liberty safeguarded by the First Amendment." 655 F.3d 78, 85 (1st Cir. 2011). Glik had used his cell phone to record audio and video of police arresting a person in Boston Common. *Id.* at 79-80. This Court reasoned that the First Amendment "encompasses a range of conduct related to the gathering and dissemination of information." *Id.* at 82. This Court also reasoned: "The proliferation of electronic devices with video-recording capability means that many of our images of current events come from bystanders with a ready cell phone or digital camera rather than a traditional film crew, and news stories are now just as likely to be broken by a blogger at her computer as a reporter at a major newspaper." *Id.* at 84. This Court observed under its Fourth Amendment analysis that Glik had "openly record[ed] the police officers" without their consent, which was not prohibited by the Massachusetts anti-eavesdropping statute as interpreted by this Court. *Id.* at 87-88.

The First Amendment protects not just *open* audio recording of police performing their duties in public (as in *Glik*), but also *secret* audio recording in such circumstances (as here).

Modern audio and video technologies are ubiquitous and flourishing. Powered by smartphones, modern cameras, and social media applications ("apps"), ordinary people can quickly, easily, and inexpensively record and share compelling and newsworthy scenes, including those involving police misconduct. Such recordings contribute to the democratic process by informing debate on important public issues, including whether police employ excessive force.

To be effective, the right to record police must include the right to record voices. It will often be impossible to ascertain whether force was reasonable absent documentation of the preceding conversation, as with Eric Garner's tragic last words: "I can't breathe." Also, an officer's words can themselves be misconduct, such as racial epithets and threats of unjustified violence.

The right to audio record police must include the right to do so secretly, or else in practice this right will be illusory. Many civilians reasonably fear how police will react to open recording. Unfortunately, some officers prevent civilians from recording them or retaliate against those who do, for example, by ordering them to stop recording, deleting the recordings, destroying the devices, or arresting them.

The Suffolk County District Attorney erroneously seeks to suppress this grassroots police accountability tool. But police themselves use body-worn cameras and squad car cameras to audio record many of these encounters. Further, many civilians in police custody in public want other civilians to record the event, to deter and document any police misconduct. Subject to an officer's prerogative to control the immediate scene, other civilians can freely stand nearby, watch, listen, take verbatim notes, secretly record video images, and openly record sounds even without the consent of those being recorded. The added increment here—secret audio recording—does not meaningfully burden the privacy of a person speaking with police in public, and any privacy interests that person has are outweighed by the public interest in government accountability.

## ARGUMENT

### I. PEOPLE USE POWERFUL TECHNOLOGIES TO RECORD AND SHARE AUDIO AND VIDEO

#### A. People Record Audio and Video With Ubiquitous Mobile Devices

Today, the widespread adoption of mobile electronic devices means that the right to record extends not just to a select few, but to everyone with a mobile device capable of recording audio or video.

As Chief Justice Roberts wrote, cell phones are "now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Riley v. California*, 573 U.S. 373,

385 (2014). Indeed, 96% of American adults own a cell phone, including 81% who own a smartphone with Internet access. Also, 52% of American adults own a tablet computer with the same capabilities.[4] Globally, there are 7.9 billion mobile subscriptions.[5]

Modern smartphones, such as those built by Apple and Google, contain camera apps that integrate audio along with video recording and do not have settings to turn off audio recording.[6] Apple and Google smartphones also come with audio-only recording apps.[7]

## B.    People Share Audio and Video With Social Media Apps

The ease with which individuals can create audio and video recordings is complemented by the ease with which they can share them. Sixty-seven percent of

---

[4] Pew Research Center, *Mobile Fact Sheet* (June 12, 2019), http://www.pewinternet.org/fact-sheets/mobile-technology-fact-sheet/.

[5] Ericsson, *Mobile subscriptions Q1 2019*, Mobility Report (June 2019), https://www.ericsson.com/en/mobility-report/reports/june-2019/mobile-subscriptions-q1-2019.

[6] Apple, *Take videos with your iPhone camera*, iPhone User Guide, https://support.apple.com/guide/iphone/take-videos-iph61f49e4bb/ios; Google, *Record a video on your Pixel phone*, Google Camera Help, https://support.google.com/googlecamera/answer/7064897?hl=en&ref_topic=6164 365.

[7] Apple, *Use the Voice Memos app*, https://support.apple.com/en-us/HT206775; Google, *Create or edit a note*, Google Keep Help, https://support.google.com/keep/answer/2888246?co=GENIE.Platform%3DAndroi d&oco=1.

smartphone owners use their devices to share photos or videos, and 35% do so frequently.[8]

This sharing often occurs on the Internet via a plethora of social media apps. Some apps allow users to upload audio and video previously taken with a smartphone. Others record audio and video within the apps and post them instantly, making the record-and-publish process seamless.

YouTube is dedicated to sharing and watching recordings of audio and video. It has over 1.9 billion monthly active users, who upload 400 hours of audio and video recordings *every minute* and watch over a billion hours of these recordings every day.[9] Instagram is a platform for sharing audio and video recordings, and photographs. It has over one billion monthly active users[10] who generate 95 million posts per day.[11] Facebook is a general-purpose social media platform with 2.4 billion monthly active users, including 1.7 billion who are active

---

[8] Pew Research Center, *U.S. smartphone use in 2015* (April 1, 2015), http://www.pewinternet.org/2015/04/01/us-smartphone-use-in-2015/.

[9] Kit Smith, *52 fascinating and incredible YouTube statistics*, Brandwatch (July 15, 2019), https://www.brandwatch.com/blog/youtube-stats/.

[10] Instagram, *Our Story*, https://instagram-press.com/our-story/.

[11] Todd Clarke, *22+ Instagram stats that marketers can't ignore this year*, Hootsuite (March 5, 2019), https://blog.hootsuite.com/instagram-statistics/.

through their mobile devices.[12] Every day, Facebook users consume 100 million hours of audio and video recordings.[13]

Some technologies allow users to record and share audio and video recordings in real-time, which is called "live streaming." Facebook Live enables users to show viewers exactly what they are observing as it happens.[14] So does Periscope, which is accessible via Twitter, another social media platform, or as a stand-alone app.[15] Ten million people have Periscope accounts, who watch 40 years of Periscope live broadcasts every day.[16]

Ordinary people act as citizen journalists, using these new technologies to record newsworthy events and publish them to a global audience. Seven percent of U.S. adults post their own news videos on social media, and 7% submit their own

---

[12] Dan Noyes, *The top 20 valuable Facebook statistics*, Zephoria Digital Marketing (Sept. 2019), https://zephoria.com/top-15-valuable-facebook-statistics/.

[13] *The Facebook video statistics everyone needs to know*, MediaKix (Sept. 18, 2018), http://mediakix.com/2016/08/facebook-video-statistics-everyone-needs-know/#gs.96p9mo.

[14] Facebook, *Facebook Live*, https://live.fb.com/.

[15] Periscope, *About Us*, https://www.periscope.tv/about; Twitter, *How to create live videos on Twitter*, https://help.twitter.com/en/using-twitter/twitter-live.

[16] Periscope, *Periscope, by the numbers* (Aug. 12, 2015), https://medium.com/periscope/periscope-by-the-numbers-6b23dc6a1704#.9ja29il34.

content to news sites.[17] Of the most watched news videos on YouTube, 39% were recorded by ordinary people.[18]

## II. PEOPLE CREATE AND SHARE NEWSWORTHY AUDIO AND VIDEO RECORDINGS OF POLICE PERFORMING THEIR OFFICIAL DUTIES IN PUBLIC

The power of citizen journalists to use their electronic devices to record and publish newsworthy events in public is perhaps most important when applied to police exercising their extraordinary powers to detain civilians, search them, and use force. These recordings ensure that troubling episodes receive the public scrutiny that they deserve, and they greatly contribute to the quality of public discussion about police use of force and continuing racial disparities in our criminal justice system. Audio recording in such circumstances is critical, and often this audio recording must be secret to be effective.

### A. Audio Recording of Police

In cases of police use of force, video images by themselves often will not tell the whole story. Verbal exchanges between officers and civilians can shed light on

---

[17] Pew Research Center, *The audience for digital news videos* (March 26, 2014), http://www.journalism.org/2014/03/26/the-audience-for-digital-news-videos/#fnref-42098-6.

[18] Pew Research Center, *YouTube & News* (July 16, 2012), http://www.journalism.org/2012/07/16/youtube-news/.

the force's reasonableness, what the officers knew, and what they should have done differently.

For example, in July 2014 in New York City, a civilian recorded Eric Garner screaming "I can't breathe" as police officers choked him to death during an arrest for selling loose cigarettes.[19] Because of this audio-video recording, Garner's final words quickly became a well-known rallying cry for the movement against police excessive force.[20]

On August 11, 2018, Baltimore Police Officer Arthur Williams confronted Deshawn McGrier, whose friend recorded the encounter. Officer Williams demanded McGrier's identification. McGrier pushed Officer Williams' hand off him and said, "Don't touch me." Officer Williams then began to repeatedly punch McGrier's face until McGrier fell to the ground. McGrier's friend posted the video on Instagram and Facebook. McGrier was treated at a hospital for a fractured jaw

---

[19] *'I Can't Breath': Eric Garner put in chokehold by NYPD – video*, The Guardian (Dec. 4, 2014), https://www.theguardian.com/us-news/video/2014/dec/04/i-cant-breathe-eric-garner-chokehold-death-video; Benjamin Mueller and Ashley Southall, *25,000 march in New York to protest police violence*, N.Y. Times (Dec. 13, 2014), http://www.nytimes.com/2014/12/14/nyregion/in-new-york-thousands-march-in-continuing-protests-over-garner-case.html.

[20] Oliver Laughland, et al., *'We can't breathe': Eric Garner's last words become protesters' rallying cry*, The Guardian (Dec. 4, 2014), https://www.theguardian.com/us-news/2014/dec/04/we-cant-breathe-eric-garner-protesters-chant-last-words.

among other injuries.[21] In response to the video, the Baltimore Police Department suspended Officer Williams, a grand jury indicted him on assault charges, and Williams eventually resigned.[22]

An officer's words (or lack thereof) will often be the misconduct itself. On recordings made by civilians, officers have been caught using racial epithets,[23] swearing at civilians and calling them "smartass,"[24] conducting custodial interrogations without a *Miranda* warning,[25] threatening to "come up with" a

---

[21] Kevin Rector and Talia Richman, *Baltimore police officer suspended with pay after viral video shows him punching, tackling man*, Baltimore Sun (Aug. 11, 2018), https://www.baltimoresun.com/news/maryland/crime/bs-md-ci-police-incident-20180811-story.html.

[22] P.R. Lockhart, *A Baltimore police officer brutally beat a Black man. It's creating new problems for the department*, Vox (Aug. 14, 2018) https://www.vox.com/identities/2018/8/13/17684438/baltimore-police-department-violence-dashawn-mcgrier-arthur-williams-indictment-assault-video.

[23] Jamel Lanee' and Peter Bernard, *St. Pete officers resigns after using racial slur*, NewsChannel8 (Jun. 12, 2018), https://www.wfla.com/news/pinellas-county/st-pete-officer-resigns-after-using-racial-slur/.

[24] *TSA detains official from Ron Paul group*, Wash. Times (April 6, 2009), https://www.washingtontimes.com/news/2009/apr/06/tsa-detains-official-from-ron-paul-group/.

[25] Jim Dwyer, *A switch is flipped, and justice listens in*, N.Y. Times (Dec. 8, 2007), http://www.nytimes.com/2007/12/08/nyregion/08about.html.

reason to arrest them,[26] encouraging one civilian to harass another civilian,[27] and making threats of unjustified violence.[28] Recording video without also recording audio will fail to detect and deter verbal police misconduct.

A restraint on audio recording police will often, in practice, function as a restraint on video recording, too. When a civilian feels they are being mistreated by police, or feels another civilian is being mistreated, it is not reasonable to expect them, before turning on their recording device, to first find the appropriate settings dashboard, ascertain how to turn off the sound, and then do so—if this is even possible on their device.[29] Thus, a ban on audio recording police could have effectively stopped civilians from video recording officers shooting people of color

[26] Patrick O'Connell and Georgina Gustin, *Officer in trouble over motorist's video in St. George*, St. Louis Post-Dispatch (Sept. 11, 2007), http://www.stltoday.com/news/local/crime-and-courts/officer-in-trouble-over-motorist-s-video-in-st-george/article_f360a76e-0af8-11e1-9a1c-0019bb30f31a.html.

[27] *Video shows cops letting onlookers taunt suspect*, CBS Chicago (Mar. 23, 2011), https://chicago.cbslocal.com/2011/03/23/video-shows-cops-letting-onlookers-taunt-suspect/.

[28] Deanna Paul and Herman Wong, *After a 4-year-old took a doll from a store, video shows Phoenix police pulling a gun on her parents*, Wash. Post (June 16, 2019), https://www.washingtonpost.com/nation/2019/06/15/after-year-old-took-doll-store-video-shows-phoenix-police-pulling-gun-parents/.

[29] *See supra* notes 6 and 7.

in the back while running away,[30] flipping upside down the desk containing a black high school student who had merely refused to stand up,[31] firing pepper spray directly into the faces of nonviolent protesters,[32] arresting civilians who were themselves protesting police misconduct,[33] deploying battlefield weaponry to respond to civil rights protesters,[34] and brutally beating Rodney King.[35]

---

[30] *Black unarmed teen Antwon Rose shot in Pittsburgh*, The Guardian (June 28, 2018), https://www.youtube.com/watch?v=ib6Q69-ta3A; Michael S. Schmidt and Matt Apuzzo, *South Carolina officer is charged with murder of Walter Scott*, N.Y. Times (April 7, 2015), https://www.nytimes.com/2015/04/08/us/south-carolina-officer-is-charged-with-murder-in-black-mans-death.html; Julie Turkewitz and Richard A. Oppel Jr., *Killing in Washington state offers 'Ferguson' moment for Hispanics*, N.Y. Times (Feb. 16, 2015), http://www.nytimes.com/2015/02/17/us/killing-in-washington-state-offers-ferguson-moment-for-hispanics.html.

[31] Richard Fausset and Ashley Southall, *Video shows officer flipping student in South Carolina, prompting inquiry*, N.Y. Times (Oct. 26, 2015), http://www.nytimes.com/2015/10/27/us/officers-classroom-fight-with-student-is-caught-on-video.html.

[32] Phillip Kennicott, *UC Davis protesters pepper-spraying raises questions about role of police*, Wash. Post (Nov. 20, 2011), https://www.washingtonpost.com/lifestyle/style/uc-davis-pepper-spraying-raises-questions-about-role-of-police/2011/11/20/gIQAOr8dfN_story.html.

[33] German Lopez, *Ferguson police arrested protestors after release of Justice Department report*, Vox (March 5, 2015), https://www.vox.com/2015/3/5/8152737/ferguson-protesters-arrests.

[34] Robert Mackey, *Images of militarized police in Baton Rouge draw global attention*, The Intercept (July 11, 2016), https://theintercept.com/2016/07/11/images-militarized-police-baton-rouge-draw-global-attention/.

[35] *The viral video that set a city on fire*, CNN (April 28, 2017), https://www.youtube.com/watch?v=1zLA2gzQQ0g.

## B.    Police Retaliation Against Recording

A ban on secret audio recording of police will often be, in practice, a ban on any recording of police. Many civilians fear that if they openly record a police officer, the officer will stop them from recording, or retaliate against them for doing so. So, if they cannot secretly record, they will not record at all.

Sadly, these fears are well-founded. For example, officers have destroyed civilians' devices,[36] confiscated their devices and footage,[37] commanded them to delete their footage on threat of arrest,[38] slapped their devices to misdirect their

---

[36] Mekahlo Medina and Michael Larkin, *New video shows woman arguing with federal agents moments before her phone is smashed*, NBC Los Angeles (April 22, 2015), https://www.nbclosangeles.com/news/local/New-Cellphone-Video-of-US-Marshal-Destroying-Womans-Phone-301024981.html.

[37] Zack Kopplin, *Alton Sterling witness: Cops took my phone, my surveillance video, locked me up*, Daily Beast (April 13, 2017), https://www.thedailybeast.com/alton-sterling-witness-cops-took-my-phone-my-surveillance-video-locked-me-up.

[38] Abby Phillip, *Woman who posted video of officer punching a suspect becomes target of Miami police union*, Wash. Post (Aug. 14, 2015), https://www.washingtonpost.com/news/post-nation/wp/2015/08/14/woman-who-recorded-officer-punching-a-suspect-becomes-target-of-miami-police-union/.

recording,[39] menaced them with guns,[40] detained them,[41] or later targeted them for false arrest.[42]

One recent right-to-record case presently before the Tenth Circuit involved a bystander openly recording Denver police officers punching a suspect in the face to get drugs out of his mouth as his head repeatedly bounced off the pavement, and tripping his pregnant girlfriend. *See Frasier v. Evans*, No. 19-1015 (10th Cir.). The police officers retaliated against Frasier by seizing his tablet without a warrant and deleting the video. Frasier was able to retrieve the video by synching his tablet with his backup cloud storage.[43]

---

[39] Marlene Lenthang, *Chicago cop under investigation after he was caught on tape repeatedly hitting a 16-year-old black boy*, Daily Mail (Dec. 4, 2018), https://www.dailymail.co.uk/news/article-6456541/Chicago-cop-caught-camera-hitting-16-year-old-head-handcuffs.html.

[40] Laura Anthony, *Rohnert Park officer being sued for drawing gun on man*, ABC 7 News (Aug. 7, 2015), https://abc7news.com/news/rohnert-park-officer-being-sued-for-drawing-gun-on-man/911687/.

[41] *See supra* note 37.

[42] Christina Carrega-Woodby, *Police assaulted, arrested Staten Island woman as revenge for filming Eric Garner video: lawsuit*, N.Y. Daily News (July 14, 2015), https://www.nydailynews.com/new-york/cops-assaulted-woman-filming-eric-garner-video-lawsuit-article-1.2291194.

[43] Chris Halsne and Chris Koeberl, *Denver Police accused of using excessive force, illegal search*, Fox31 Denver (Nov. 24, 2014), https://kdvr.com/2014/11/24/denver-police-accused-of-excessive-force-illegal-search/.

### III. THE FIRST AMENDMENT PROTECTS THE RIGHT TO SECRETLY AUDIO RECORD POLICE PERFORMING THEIR OFFICIAL DUTIES IN PUBLIC

This Court held that "Glik's exercise of his First Amendment rights fell well within the bounds of the Constitution's protections." *Glik*, 655 F.3d at 84. This holding in favor of Glik, who had openly audio and video recorded Boston police officers arresting another man in Boston Common without their consent, was supported by "[b]asic First Amendment principles, along with case law from this and other circuits." *Id.* at 82. The same is true for the issue on appeal here: whether civilians may *secretly* audio record police performing their official duties in public.

#### A. The First Amendment Protects Information Gathering

Information cannot be shared if it is not first gathered. Thus, the First Amendment protects not just the publication of information, *see, e.g., New York Times Co. v. U.S.*, 403 U.S. 713 (1971), but also the collection of that information.

In *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972), the Supreme Court stated, "Nor is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of the press could be eviscerated." *Accord ACLU of Illinois v. Alvarez*, 679 F.3d 583, 598 (7th Cir. 2012); *Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017).

In *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 (1980), the Supreme Court, citing *Branzburg*, held that criminal trials must be open to the

public. The Court stated, "The explicit, guaranteed rights to speak and to publish concerning what takes place at a trial would lose much meaning if access to observe the trial could, as it was here, be foreclosed arbitrarily." *Id*. at 576–77.

Similarly, in striking down the removal of books from a public school library, the Supreme Court emphasized that, under the First Amendment, "the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom." *Board of Educ. v. Pico*, 457 U.S. 853, 867 (1982) (emphasis in original).

Other circuits, in upholding the First Amendment right to record the police, have explained that recording is a necessary predicate to publication: "The right to publish or broadcast an audio or audiovisual recording would be insecure, or largely ineffective, if the antecedent act of *making* the recording is wholly unprotected[.]" *Turner*, 848 F.3d at 689 n.41 (quoting *Alvarez*, 679 F.3d at 595) (emphasis in original).

## B.     Recording Police Advances Government Accountability

How police officers exercise their extraordinary government powers is a matter of profound public concern. Audio and video recordings of officers performing their official duties in public can play a critical role in holding the police accountable.

One of the "major purpose[s]" of the First Amendment is "to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). *Accord Glik*, 655 F.3d at 82; *Alvarez*, 679 F.3d at 601; *Turner*, 848 F.3d at 689. *See also Richmond Newspapers*, 448 U.S. at 575 (one of the "core purposes" of the First Amendment is to facilitate "communication on matters relating to the functioning of government"); *Thornhill v. State of Alabama*, 310 U.S. 88, 101–02 (1940) (individuals have "the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment").

Were police officers granted the power to restrict civilian recordings, they would control the information ultimately available to the public about their own conduct. The First Amendment "prohibit[s] government from limiting the stock of information from which members of the public may draw." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978). *Accord Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3rd Cir. 2017); *Alvarez*, 679 F.3d at 597; *Turner*, 848 F.3d at 688.

Other circuits, in upholding the First Amendment right to record the police, emphasize that civilian recordings advance government accountability. The Eleventh Circuit stated, "The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest." *Smith v. City of Cumming*, 212 F.3d

1332, 1333 (11th Cir. 2000). The Fifth Circuit stated, "Filming the police contributes to the public's ability to hold the police accountable, ensure that police officers are not abusing their power, and make informed decisions about police policy." *Turner*, 848 F.3d at 689. The Third Circuit stated, "These videos have helped police departments identify and discipline problem officers." *Fields*, 862 F.3d at 360. And the Seventh Circuit held that "the First Amendment provides at least some degree of protection for gathering news and information, particularly news and information about the affairs of government." *Alvarez*, 679 F.3d at 597.

### C. Audio and Video Recordings Are Inherently Expressive Mediums and Thus the First Amendment Protects the *Process* of Making Them

Audio and video recordings are inherently expressive mediums entitled to First Amendment protection. *See Hurley v. Irish-American Gay*, *Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 568 (1995) (holding that mediums with "inherent expressiveness" are protected by the First Amendment). In *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501–02 (1952), the Supreme Court held that movies are protected. In *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981), the Court held that radio and television are protected.[44]

---

[44] Many other mediums of expression likewise enjoy full First Amendment protection. *See, e.g., Kaplan v. California*, 413 U.S. 115, 119–20 (1973) (photographs); *Hurley*, 515 U.S. at 568-69 (parades); *Ward v. Rock Against*

The First Amendment also fully protects the communications medium where people today most frequently publish their audio and video recordings: the Internet. It is a "dynamic, multifaceted category of communication" where anyone "can become a town crier with a voice that resonates farther than it could from any soapbox." *Reno v. ACLU*, 521 U.S. 844, 870 (1997). Indeed, the Supreme Court held: "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the vast democratic forums of the Internet in general, and social media in particular." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (internal quotations and citation omitted).

Because audio and video recordings are protected by the First Amendment, it follows that the process of making them is also protected. "Speech" is a process that contains a continuum of events protected by the First Amendment. *See Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 336 (2010) ("Laws enacted to control or suppress speech may operate at different points in the speech process."). Thus, the First Amendment protects not just the end-products in the speech process (here, audio and video recordings), as well as their subsequent sharing or publication, but also their *creation. See Sorrell v. IMS Health Inc.*, 564

---

*Racism*, 491 U.S. 781, 790 (1989) (music); *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009) (monuments).

U.S. 552, 570 (2011) ("the creation and dissemination of information are speech within the meaning of the First Amendment"); *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 792 n.1 (2011) ("Whether government regulation applies to creating, distributing, or consuming speech makes no difference."); *U.S. v. Stevens*, 559 U.S. 460, 482 (2010) (holding unconstitutional a federal statute that outlawed not only the possession or sale of photos and videos of animal cruelty, but also their creation). *See also Western Watersheds Project v. Michael*, 869 F.3d 1189, 1196 (10th Cir. 2017) ("If the creation of speech did not warrant protection under the First Amendment, the government could bypass the Constitution by simply proceeding upstream and damming the source of speech.") (internal quotations and citation omitted).

Other circuits, in upholding the First Amendment right to record the police, have emphasized that the First Amendment protects the creation of recordings. The Seventh Circuit in *Alvarez*, stated, "Criminalizing all nonconsensual audio recording necessarily limits the information that might later be published or broadcast—whether to the general public or to a single family member or friend— and thus burdens First Amendment rights." 679 F.3d at 597 . The Fifth Circuit in *Turner*, stated, "[T]he First Amendment protects the act of making film, as 'there is no fixed First Amendment line between the act of creating speech and the speech

itself.'" 848 F.3d at 689 (quoting *Alvarez*, 679 F.3d at 596). The Fifth Circuit

further explained:

> [T]he Supreme Court has never "drawn a distinction between the
> process of creating a form of pure speech (such as writing or painting)
> and the product of these processes (the essay or the artwork) in terms
> of the First Amendment protection afforded. Although writing and
> painting can be reduced to their constituent acts, and thus described as
> conduct, we have not attempted to disconnect the end product from the
> act of creation."

*Id*. (quoting *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061-62 (9th Cir.

2010)).

### D. The First Amendment Right to Record Police Includes the Right to Record Voices

The utility of audio recording is especially potent when applied to how

police use their extraordinary powers. Audio recording can be far more effective

than any other method to assess whether an officer used excessive force or engaged

in other forms of misconduct. *See supra* Part II.A.

In *Alvarez*, the Seventh Circuit preliminarily enjoined the application of the

Illinois eavesdropping statute to audio recordings of police officers performing

their official duties in public, as well as of the civilians those officers speak with.

679 F.3d at 608. In support of this First Amendment ruling, the court reasoned:

"audio and audiovisual recording are uniquely reliable and powerful methods of

preserving and disseminating news and information about events that occur in

public. Their self-authenticating character makes it highly unlikely that other methods could be considered reasonably adequate substitutes." *Id.* at 607.

Other judicial opinions likewise have held that the First Amendment right to record includes audio recording. *See, e.g., Gericke v. Begin*, 753 F.3d 1, 3 (1st Cir. 2014) (affirming denial of qualified immunity for police officers accused of retaliating against a motorist who attempted to audio record their traffic stop); *Fields,* 862 F.3d at 360 ("the public has the commensurate right to record— photograph, film, or audio record—police officers conducting official police activity in public areas"); *State of Hawai'i v. Russo*, 141 Hawai'i 181, 193-94 (2017) (holding that the First Amendment applies to a civilian's recording of their own conversations with police officers).

### E. The First Amendment Right to Record Police Includes Doing So Secretly

Many police officers have retaliated against civilians for recording them, or interfered in their recording. *See supra* Part II.B. *See also Fordyce v. City of Seattle*, 55 F.3d 436, 439, 442 (9th Cir. 1995) (remanding for trial whether an officer had "assaulted and battered" a civilian "in an attempt to prevent or dissuade him from exercising his First Amendment right to film matters of public interest").

As a result, many civilians will refrain from recording police, unless they can do so secretly. A motorist stopped by the side of the road, fearful that the officer is growing increasingly agitated, should not have to choose between openly turning

on their recording device, which may further agitate the officer, or abstaining from making a recording. Likewise, if a pedestrian comes upon officers using force against a civilian, the pedestrian may fear that if they visibly begin to record the event, they will draw the officers' ire. The pedestrian should not have to choose between open recording and no recording.

### F.  Police Recordings Are No Substitute for Civilian Recordings

While recordings made by police officers themselves (such as with body-worn cameras or dashboard cameras) may provide some benefits,[45] they are inadequate substitutes for civilian recordings.

Officers often fail to record their enforcement activity.[46] Even if they do, police departments often refuse to disclose the recordings of newsworthy

---

[45] Brett Chapman, *Body-worn cameras,* Nat'l Institute of Justice (Nov. 14, 2018), https://nij.ojp.gov/topics/articles/body-worn-cameras-what-evidence-tells-us.

[46] *See, e.g.,* Justin Hicks, *Concerns mount in South Bend after a white police officer kills a Black man*, NPR (June 21, 2019), https://www.npr.org/2019/06/21/734665327/concerns-mount-in-south-bend-after-a-white-police-officer-kills-a-black-man.

incidents.[47] For example, Chicago officials refused for 13 months to release a dashboard camera video of a police officer fatally shooting Laquan McDonald.[48]

Additionally, civilians often record valuable information that officers cannot. For example, an officer's body-worn camera cannot fully capture what the officer is doing, and video captured by an officer engaged in a physical altercation may be chaotic or blurry.[49]

The Third Circuit recognized the limits of police-created videos: "Bystander videos provide different perspectives than police and dashboard cameras, portraying circumstances and surroundings that police videos often do not capture. Civilian video also fills the gaps created when police choose not to record video or withhold their footage from the public." *Fields*, 862 F.3d at 359.

---

[47] Ryan J. Foley, *AP analysis: Police routinely deny access to officer video footage,* PBS News Hour (March 13, 2019), https://www.pbs.org/newshour/nation/ap-analysis-police-routinely-deny-access-to-officer-video-footage.

[48] Kyung Lah, *Laquan McDonald shooting: Why did it take 13 months to release video?*, CNN (Dec. 2, 2015), http://www.cnn.com/2015/12/01/us/chicago-police-shooting-explainer/.

[49] Timothy Williams, et al., *Police body cameras: What do you see?,* N.Y. Times (April 1, 2016), http://www.nytimes.com/interactive/2016/04/01/us/police-bodycam-video.html; German Lopez, *The failure of police body cameras,* Vox (July 21, 2017), https://www.vox.com/policy-and-politics/2017/7/21/15983842/police-body-cameras-failures.

## IV. CRIMINALIZING THE SECRET AUDIO RECORDING OF CONVERSATIONS BETWEEN POLICE AND CIVILIANS IN PUBLIC DOES NOT ADVANCE PRIVACY, AND ANY CIVILIAN PRIVCY INTERESTS ARE OUTWEIGHED BY THE PUBLIC INTEREST IN GOVERNMENT ACCOUNTABILITY

The Suffolk County District Attorney, in arguing that it should be a crime to secretly audio record police officers performing their official duties in public, expresses particular concern about the civilians whom officers talk with. She does not argue, however, that civilians have a general privacy interest in their public conversations. Rather, she argues for "a specific type of privacy—not freedom from being recorded, but rather notice of being recorded." Def. Br. at 42. *See also id.* at 45-46 (Commonwealth seeks to "assur[e] that people are aware of when they are being recorded," and is not concerned about "a vague and nebulous notion of undifferentiated 'privacy interests'"); Martin and Pérez Br. at 34-39.

Nevertheless, to the extent that this Court may be concerned about the privacy implications of secretly audio recording the civilians whom police officers interact with in public, *amicus* writes to assure the Court that the privacy interests are either non-existent or limited, and any civilian privacy interests are outweighed by the public interest in police accountability. This is especially true in the context of a statute that authorizes *open* audio recording irrespective of the consent or non-consent of the other parties. *See Glik*, 655 F.3d at 87-88.

The common law invasion of privacy tort, also called intrusion upon seclusion, is instructive as it balances First Amendment rights, including the right to record, with privacy rights. The elements are 1) the defendant intentionally invaded a place or conversation in which the plaintiff had a reasonable expectation of privacy, and 2) the invasion was in a manner highly offensive to a reasonable person. *See, e.g., Shulman v. Group W Productions, Inc.*, 18 Cal. 4th 200, 231-32 (1988).

The first element reflects the longstanding legal principle that the government has an important interest in protecting *private* conversations. *See, e.g., Bartnicki v. Vopper*, 532 U.S. 514, 532 (2001). This important interest undergirds the many federal and state anti-eavesdropping statutes that limit the audio recording of conversations where there is a reasonable expectation of privacy or of non-recording. *See, e.g.*, 18 U.S.C. § 2510(2) (federal eavesdropping law). Thus, the invasion of privacy tort does not bar secret audio recording of a conversation in public that can be heard by other people. *See, e.g., Wilkins v. NBC*, 71 Cal. App. 4th 1066, 1078-80 (1999).

Here, however, the Massachusetts anti-eavesdropping statute is not limited to conversations where the participants have a reasonable expectation of privacy; rather, the overbroad law bans secret audio recording of *all* conversations. *Glik*, 655 F.3d at 86. *See also* Mass. Gen. Laws 272 §§ 99(B)(4), (C)(1). When enforced

against the many police-civilian conversations that are not private, this law does not advance privacy. *Cf. Alvarez*, 679 F.3d at 606 ("by legislating this broadly—by making it a crime to audio record *any* conversation, even those that are *not* in fact private—the State has severed the link between the eavesdropping statute's means and its end") (emphasis in original). For example, the law does not advance privacy when enforced against civilians who secretly audio record *their own* conversations with police; or when enforced against a bystander who secretly audio records a conversation between a civilian and an officer in public, given that civilians are already subject to audio recording by the Boston police department's body-worn cameras.[50]

To the extent that a civilian in conversation with a police officer in public might have privacy interests in not being secretly audio recorded by a bystander, such interests are limited. The bystander has the right, undisputed on appeal, to openly audio record without consent, secretly record a silent video, or use non-electronic means such as taking notes to chronicle the encounter between the officer and the other civilian. *See* Def. Br. at 52-53. The added increment of *secret* audio recording will rarely intrude on privacy, as those who prefer to speak

---

[50] *See The Boston Police Department will begin implementing body worn cameras on Monday June 3, 2019*, Boston Police Dept. News (May 31, 2019), https://bpdnews.com/news/2019/5/31/body-worn-cameras.

privately with an officer in public may do so by simply moving with the officer a short distance away from bystanders, turning their back, and speaking in a low volume.

In analyzing the second element of the invasion of privacy tort, whether the invasion was highly offensive to a reasonable person, courts consider the First Amendment interests at issue. *See, e.g., Shulman*, 18 Cal. 4th at 236-37 (considering "the legitimate motive of gathering the news"). Thus, the invasion of privacy tort does not bar one civilian from recording another civilian as they interact with police in public. *See, e.g., Haynik v. Zimlich*, 508 N.E.2d 195, 200-01 (Ohio Ct. C.P. 1986). Similarly, here, any privacy interests one person might have in not being secretly audio recorded by another person while in conversation with police officers in public is outweighed by the First Amendment interest of the second person in creating a record of the event that greatly improves the quality of proof of any police misconduct.[51]

---

[51] Recording with unusually sensitive equipment may intrude on low-volume conversations in public. *Cf. Wolfson v. Lewis*, 924 F. Supp. 1413, 1433-34 (E.D. Pa. 1996) (privacy invasion from aiming "shotgun mike" at private home). But the recording in this case does not raise such concerns; rather, it involves the ordinary recording tools built into typical consumer mobile devices.

Thus, the Massachusetts anti-eavesdropping statute's categorical approach to liability fails to accommodate competing rights or allow for contextual case-by-case analysis as required by the First Amendment.[52]

## V. THE FIRST AMENDMENT RIGHT TO RECORD IS NOT LIMITED TO POLICE PERFORMING THEIR OFFICIAL DUTIES IN PUBLIC

The First Amendment protects the right to record how police officers exercise their extraordinary powers in public, including the right to secretly audio record such officers and the civilians they speak to. This, of course, is not the outer limit of the First Amendment right to record. In deciding this appeal, *amicus* EFF urges this Court to eschew any language that would unduly impede the continued judicial development of this right, in at least three contexts.[53]

First, the First Amendment right to record *police* who are performing their official duties will often extend to *non-public* places, such as private homes when the residents are the ones doing the recording. *Amicus* argues that the rule should be whether police officers have a reasonable expectation of privacy, irrespective of

---

[52] This case does not raise (1) recording by the government, which is limited by the Fourth Amendment and not protected by the First Amendment, or (2) recording that is automated and pervasive, which poses special threats to privacy. *See Carpenter v. U.S.*, 138 S. Ct. 2206 (2018).

[53] Although the parties whom *amicus* supports (Plaintiffs-Appellees Martin and Pérez) do not address these issues on appeal, we nevertheless address these issues because they implicate EFF's interests.

whether they are in a public or private place. *See, e.g.*, *Gaymon v. Borough of Collingdale*, 150 F. Supp. 3d 457, 469 (E.D. Pa. 2015) (on a motion to dismiss, court held that a jury could reasonably conclude that police officers violated plaintiff's rights when they arrested her inside her home for recording them); *J.A. v. Miranda*, 2017 WL 3840026, at *6 (D. Md. 2017) (on a motion to dismiss, court held that police violated plaintiff's First Amendment right to record when officers beat and arrested him for using his cell phone to record them arresting his brother in the living room of his home). *Cf. Jean v. Massachusetts State Police*, 492 F.3d 24, 30 (1st Cir. 2007). Thus, we urge this Court not to adopt any language that would limit the right to record police officers performing their official duties to *only public places*.

Second, the First Amendment right to record should also include the recording of *government officials*, other than police, performing their official duties. As with the police, the rule should be whether government officials have a reasonable expectation of privacy. Firefighters and emergency medical services (EMS) providers are another group of government officials whom civilians have a First Amendment right to record performing their official duties, particularly when first responders do their jobs in newsworthy ways.[54] Thus, in emphasizing the

---

[54] *See, e.g.*, Aundrea Cline-Thomas and Dan Stamm, *Raw video shows heroin antidote saving mother's life*, NBC 10 Philadelphia (Feb. 12, 2016), http://www.nbcphiladelphia.com/news/health/Heroin-Overdose-West-Deptford-

special concerns at issue with regard to the police, *amicus* does not suggest that the First Amendment right to record should be limited to *only police*.

Third and finally, the First Amendment right to record *non-government actors* should, as discussed above, *see supra* Part IV., balance their reasonable expectation of privacy or of non-recording with First Amendment interests such as whether the conversation is newsworthy. *See, e.g., Shulman*, 18 Cal. 4th at 231-32, 236-37.

## CONCLUSION

*Amicus* EFF respectfully asks this Court to hold that the First Amendment protects the right to secretly audio record police officers performing their official duties in public, and that the Massachusetts anti-eavesdropping statute violates the First Amendment as applied to such recording.

Dated: October 3, 2019

Respectfully submitted,

/s/ *Sophia Cope*
Sophia Cope (Bar No. 1190340)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, California 94109
sophia@eff.org
(415) 436-9333

---

Narcan-Antidote-Saving-Lives-368592941.html; Andrew Siff, *4 EMS Workers suspended without pay in chokehold arrest*, NBC 4 New York (July 21, 2014), http://www.nbcnewyork.com/news/local/Staten-Island-Chokehold-Arrest-Death-Staten-Island-Eric-Garner-Video-NYPD-267913291.html.

Adam Schwartz
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, California 94109
adam@eff.org
(415) 436-9333

*Counsel for Amicus Curiae* ELECTRONIC FRONTIER FOUNDATION

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify as follows:

1.     This Brief of *Amicus Curiae* Electronic Frontier Foundation in Support of Plaintiffs-Appellees Martin and Pérez and Affirmance of the Opinion Below of December 10, 2018 complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because this brief contains 6,473 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016, the word processing system used to prepare the brief, in 14-point font in Times New Roman font.

Dated:  October 3, 2019

By:  */s/ Sophia Cope*
Sophia Cope

*Counsel for Amicus Curiae*
ELECTRONIC FRONTIER FOUNDATION

# CERTIFICATE OF SERVICE

I certify that on this 3rd day of October, 2019, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit using the Court's CM/ECF system. All of the following participants in this case are registered CM/ECF users, so they will be served by the appellate CM/ECF system:

Benjamin T. Barr, ben@statecraftlaw.com
William D. Dalsen, wdalsen@proskauer.com
Ryan Edmund Ferch, rferch@mbta.com
Peter Martin Geraghty, peter.geraghty@pd.boston.gov
Eric A. Haskell, eric.haskell@mass.gov
Daniel J. Kelly, dkelly@mccarter.com
Stephen R. Klein, steve@statecraftlaw.com
Matthew P. Landry, matthew.landry@mass.gov
Matthew Michael McGarry, matthew.mcgarry@boston.gov
Randall E. Ravitz, randall.ravitz@mass.gov
Jessie J. Rossman, jrossman@aclum.org
Matthew R. Segal, msegal@aclum.org

Dated: October 3, 2019          By: /s/ *Sophia Cope*
                                    Sophia Cope

                                *Counsel for Amicus Curiae*
                                ELECTRONIC FRONTIER FOUNDATION